[No. E036982. Fourth Dist., Div. Two. June 22, 2007.]

AMANDA ERMOIAN, a Minor, etc., Plaintiff and Appellant, v.
DESERT HOSPITAL et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.110.1, this opinion is certified for publication with the exception of part IV.A., B., D., E., and F.

**COUNSEL**

Law Offices of Baum and Baum and Ted Baum for Plaintiff and Appellant.

Helton Law Group, Ralph G. Helton and Carrie S. McLain for Defendants and Respondents.

**OPINION**

**KING, J.**—Plaintiff Amanda Ermoian (Amanda) was born with brain abnormalities that left her severely mentally retarded and unable to care for herself. Her conditions could not have been prevented, treated, or cured in utero. Through her guardian ad litem, she sued Desert Hospital (the Hospital) and Maria Sterling, a registered nurse, for wrongful life, breach of contract, and promissory estoppel. She claims that defendants were negligent in, among other ways, failing to inform her mother of her abnormalities prior to her birth. Their negligence, she contends, deprived her mother of the opportunity to make an informed choice to terminate the pregnancy. As a result, her mother did not have an abortion, and she was born. The court granted

defendants' motion for summary adjudication on the breach of contract and promissory estoppel claims. The wrongful life cause of action was tried by the court, which found for defendants.

Amanda contends that we should conduct a de novo review of the trial court's findings and direct the trial court to enter judgment in her favor. In the published portion of this opinion, we explain that the applicable standard of review is the substantial evidence standard, and conclude that substantial evidence supports the express and implied findings necessary to support the judgment. In the unpublished portion of the opinion, we reject Amanda's arguments that the court erred in denying Amanda's motion to have certain requests for admissions be deemed granted, that the court erred in granting defendants' motion for summary adjudication, and that certain legal and evidentiary rulings by the trial court require reversal.

## I. SUMMARY OF FACTS[1]

In 1994, the Hospital operated Desert Hospital Outpatient Maternity Services Clinic (the clinic), a comprehensive perinatal services program (CPSP) for Medi-Cal patients. Under this CPSP, and pursuant to Medi-Cal regulations, the Hospital provided psychosocial, nutrition, and health education services, and related case coordination to Medi-Cal patients during and after pregnancy. The Hospital contracted with a corporation controlled by Morton Gubin, M.D., which employed Masami Ogata, M.D., to provide obstetrical services to the clinic's patients.[2] Drs. Gubin and Ogata, who had a private practice located elsewhere, saw the clinic's patients at the clinic's facility. The physicians are not employees of the Hospital.

In January 1994, Jackie Shahan (Shahan), Amanda's mother, went to the Hospital emergency room because of cramping, hives, headaches, and vomiting. Shahan did not have her own physician at that time. The emergency room physician informed Shahan that she was pregnant and referred her to Drs. Gubin and Ogata.

On January 13, 1994, Shahan went to the clinic and met with Carol Cribbs, a comprehensive perinatal health worker. Shahan filled out a questionnaire in which she answered "yes" to the question, "Do you want to continue this

---

[1] In accordance with our standard of review, we summarize the evidence in the light most favorable to defendants, giving them the benefit of every reasonable inference, and resolving any conflicts in the evidence in support of the judgment. (See *Aceves v. Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 507 [156 Cal.Rptr. 41, 595 P.2d 619], overruled on another point in *Privette v. Superior Court* (1993) 5 Cal.4th 689, 696 [21 Cal.Rptr.2d 72, 854 P.2d 721]; *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 642, fn. 3 [11 Cal.Rptr.3d 807].)

[2] According to Dr. Gubin, Dr. Ogata's "corporation was employed by my corporation."

pregnancy?" In response to the question, "What are your hopes for this pregnancy?" Shahan stated, "To have a healthy baby." Nevertheless, she testified that she had "mixed feelings" about the pregnancy and was not sure if she would "keep Amanda or not."

Shahan was given a document titled, "patient rights and responsibilities." Among other "rights," this document states that Shahan has the right to "[r]eceive any explanations on any tests or office procedures and answer[s to] any questions [she] may have," "[r]eview [her] medical record·with a doctor and/or nurse," and "[p]articipate in making any plans and/or decisions about [her] care, and that of [her] baby, during the pregnancy, labor, delivery and postpartum."[3] Cribbs signed the document as a "witness."

Shahan also signed an "informed consent" form regarding alpha-fetoprotein testing. According to the form, the alpha-fetoprotein test is a blood test, the "major purpose" of which "is to detect fetuses with neural tube defects, such as spina bifida and anencephaly." The form states, among other things: "I understand that if the fetus is found to have a birth defect, the decision whether or not to continue the pregnancy will be entirely mine."[4] Cribbs told Shahan that she would be notified if there were any problems with the pregnancy. The alpha-fetoprotein test was negative, indicating "no increased risk of neural tube defects."

On January 25, 1994, Shahan met with Dr. Gubin. Dr. Gubin explained that he was in charge of the clinic. Shahan told Dr. Gubin that she might want to have an abortion. Dr. Gubin said he did not perform abortions at the clinic and she "would have to go somewhere else" for that. Dr. Gubin examined Shahan and let Shahan hear the fetus's heartbeat. Upon hearing the heartbeat, Shahan decided she would not have an abortion.

After meeting with Dr. Gubin, Shahan met with Sterling. Sterling was a registered nurse and Shahan's CPSP case coordinator. Sterling scheduled an

---

[3] These rights mirror the patient rights set forth in Medi-Cal regulations at California Code of Regulations, title 22, section 51348.2, subdivision (c), which provides: "The patient has the right to be treated with dignity and respect, to have her privacy and confidentiality maintained, to review her medical treatment and record with her physician or practitioner, to be provided explanations about tests and clinic procedures, to have her questions answered about procedures, to have her questions answered about her care, and to participate in the planning and decisions about her management during pregnancy, labor and delivery."

[4] According to the respondent's brief, Shahan also signed a form titled "Conditions of Services at Desert Hospital," which purportedly provides that "physicians are independent contractors and not employees or agents of [the Hospital]." The brief cites to an exhibit in the respondent's appendix. The referenced exhibit is not included in the respondent's appendix and the record does not indicate that this document was admitted into evidence. If such a document exists, we agree with Amanda that we cannot consider it.

ultrasound for January 28. Sterling told Shahan that Shahan would get the results of the ultrasound and be provided with all the information she needed.

After her visit to the clinic, Shahan returned home, where she lived with Amanda's father, Martin Ermoian (Ermoian). She told Ermoian that she was not going to get an abortion. According to Shahan, Ermoian agreed, but "he wasn't sure still."

On January 28, Shahan underwent the scheduled ultrasound at the Hospital. The ultrasound technician told Shahan that "Amanda was fine." After the ultrasound, Shahan told Ermoian that she was "not going to have an abortion." The two of them "decided then that [they] were going to keep Amanda."

The radiologist's report regarding the January 28 ultrasound indicates that the gestational age of the fetus was 20.1 weeks, plus or minus 1.4 weeks. The report does not indicate any abnormalities.

Dr. Ogata met with Shahan on February 22 and talked with her about the January 28 ultrasound. Dr. Ogata told Shahan that the fetus was healthy. Shahan also spoke with Cribbs, who told her that everything was normal and that the baby was healthy. Cribbs noted in Shahan's chart that she and Shahan discussed the visit with the physician, and that the ultrasound was normal.

On March 21, Shahan called Sterling and complained of abdominal pain and hallucinations. Sterling told Shahan to go to the labor and delivery department of the Hospital. Sterling wrote in Shahan's medical chart that Shahan was sent to the Hospital "for evaluation." At the Hospital, Shahan underwent an ultrasound due to a possible abruption of the placenta. Sterling testified that she "had nothing to do with that ultrasound," and was not aware that an ultrasound "was being done."[5] Neither Dr. Gubin nor Dr. Ogata saw Shahan that day.

The radiologist's written report regarding the March 21 ultrasound states that the fetus is "viable" and is 25.8 weeks old, plus or minus 1.8 weeks. It further states: "Scans of the fetal head show minimal prominence of the lateral ventricles with lateral ventricular measurement of between 11 and 12mm (upper limits of normal 10mm). Follow-up ultrasound scanning is recommended to confirm or exclude fetal hydrocephalus. No morphologic abnormalities are seen within the fetal axial skeleton or body." Under the

---

[5] This conflicts with Shahan's testimony. According to Shahan, Sterling told her that she was going to have another ultrasound at the Hospital. Shahan further testified that she asked Sterling if she would get the results of the ultrasound, and Sterling said they would notify Shahan if there were any problems.

heading, "Impression," the report states: "Slight prominence of fetal ventricular size which measures approximately 12mm (upper limits of normal 10mm). Follow-up ultrasound scanning is recommended in 4 to 6 week[s]. [¶] . . . There has been normal interval fetal growth since previous ultrasound of [January 28]." (Capitalization omitted.) The report is addressed to Dr. Ogata, and concludes: "[R]eport called to Dr. Ogata at 1145 hours on [March 21]."[6] (Capitalization omitted.) According to Dr. Gubin, the fetus was viable as of March 21,[7] and they "had no feeling there was any abnormality."

The next day, March 22, Shahan was examined by Dr. Ogata at the clinic. As of that date, the clinic had not received the written report of the March 21 ultrasound. According to Shahan, Dr. Ogata discussed the ultrasound with her and told her that the ultrasound indicated that the head of the fetus might be small, but that it was not a concern. He told her that the baby was healthy, and they would repeat the ultrasound in four to six weeks to check the head.

Sterling talked with Dr. Ogata about "the heart tones that [Shahan] heard, the measurements that the doctor had gotten." She made a note in Shahan's medical chart to "repeat ultrasound next visit." The note also states, "size vs dates."

Sterling then talked with Shahan. Sterling was apparently unaware of the results of the ultrasound performed the night before or of any problem with the fetus at that time.[8] Sterling "opened up the chart and copied for [Shahan]

---

[6] Neither Dr. Ogata nor the radiologist testified at trial. Other than the reference to the call to Dr. Ogata on the ultrasound report, there was no direct evidence of what the radiologist told Dr. Ogata about the ultrasound.

[7] Dr. Gubin stated that "viable" means a "baby that is alive and capable of surviving outside the uterus."

[8] Sterling was never directly asked at trial if, on March 22, she was aware of the March 21 ultrasound or the ultrasound results. There was, however, evidence from which the court could infer that she did not know of the ultrasound or the contents of the ultrasound report. Dr. Gubin testified that even if the radiologist had called Dr. Ogata about the ultrasound, that "wouldn't necessarily mean that Miss Sterling knew that he had been contacted the day before." Sterling stated that she talked with Dr. Ogata only about the fetal heart tones and measurements. In response to a question about whether Sterling had asked Shahan if she understood the ultrasound results, Sterling stated, "We wouldn't have had the ultrasound report in her chart." When asked whether she recorded anything in Shahan's chart about ensuring that Shahan had an understanding about what was going on in the brain of the fetus, Sterling stated that she "didn't know there was anything going on with the baby." Although Sterling's statements to these questions are arguably nonresponsive to the questions posed, they suggest that Sterling was unaware of the ultrasound results and therefore had no reason to ask Shahan about the ultrasound or to make sure that Shahan understood what was going on in the baby's brain. She further testified that the only problem she was aware of at that time that called for an "intervention," or further action, was the signs of preterm labor. The absence of any reference to the ultrasound in Sterling's notes about the March 22 visit further suggests that Sterling did not know of the ultrasound report at that time.

exactly what the doctor told her . . . ." In her notes regarding her meeting with Shahan, Sterling indicated that she talked to Shahan about bed rest and the "signs and symptoms of labor and pre-term labor." According to Shahan, Sterling told her that "everything was fine" and that they would let her know if there was any problem with the ultrasound. This was the last time Sterling saw Shahan in the clinic.

By this time, Shahan and Ermoian were in agreement that Shahan would have the baby, and the "issue of abortion . . . no longer existed."

Shahan's next visit to the clinic took place on March 29. An ultrasound was not performed at that time. At trial, Sterling explained the apparent inconsistency between her March 22 note to "repeat ultrasound next visit" and the failure to obtain an ultrasound at the next visit as follows: When Dr. Ogata examined Shahan on March 22, his measurements of Shahan (the size) indicated a gestational age of 22 weeks; the note "size vs dates" refers to a discrepancy between the estimated age of the fetus based upon the size and the previously estimated gestational age of 28 weeks, which was based upon the January 28 ultrasound (the dates). Dr. Ogata recommended that an ultrasound be obtained at Shahan's next visit to resolve this discrepancy "if the measurements were still wrong." At Shahan's March 29 visit, the measurements "were very good according to her due date." In addition, the March 21 ultrasound report (which indicated a gestational age of approximately 25.8 weeks) had by that time been received and placed in Shahan's chart. Thus, an ultrasound on March 29 "would not have been ordered because at that time it wasn't warranted by the doctor and he didn't give us an order to schedule [an ultrasound]." Dr. Gubin's testimony corroborated Sterling's explanation.

During the March 29 visit to the clinic, Shahan met with Carol Cribbs and either Dr. Ogata or Dr. Gubin.[9] Shahan complained of cramping, abdominal pain, and headaches. Cribbs told Shahan that these problems were normal and that the baby was healthy. There is no evidence in the record that Cribbs had any knowledge of the March 21 ultrasound or of any problem with the fetus. Nor is there evidence of what was discussed between the physician and Shahan during that visit.[10]

---

[9] Shahan testified that she met with Dr. Ogata on March 29. Dr. Gubin testified that, based upon his review of the records, he, not Dr. Ogata, met with Shahan on that date. However, he could not recall the meeting. When Sterling was asked if Dr. Gubin saw Shahan on March 29, she replied, "That's what he said." She could not, however, find anything in Shahan's medical chart that indicated that Dr. Gubin saw Sterling that day.

[10] Although Shahan testified that she met with Dr. Ogata, she was not asked, and did not say, what transpired during the meeting. Neither Dr. Ogata nor Cribbs testified at trial.

On April 11, Shahan called the clinic to complain of headaches, cramping, spotting, vomiting, and hallucinations. She was told to get bed rest, and to come into the clinic on April 19. On April 19, she met with Dr. Ogata. Dr. Ogata told Shahan that she might be going into premature labor and told Shahan to rest. Shahan testified that she asked about the March 21 ultrasound and was told that "everything was okay."

On April 28, Shahan called Sterling to report "the same complaints." Sterling told Shahan she would have another ultrasound. Shahan asked Sterling why she was having another ultrasound and if there was a problem. Sterling told her that everything was fine and that she was scheduled for another ultrasound.

On May 6, Dr. Ogata ordered an ultrasound for Shahan. According to Shahan, she was told that someone would call and let her know the results of the ultrasound if there was a problem. The scheduled ultrasound was performed on May 9. The radiologist's report regarding the ultrasound states that "there is evidence of microcephaly, which may be worsening since the previous study of [March 21]. There is also evidence of enlargement of the lateral ventricles, probably not significantly changed." (Capitalization omitted.) The gestational age was estimated at 32.5 weeks, plus or minus 2.4 weeks. The report does not indicate that the radiologist called anyone at the clinic, Dr. Gubin, or Dr. Ogata to inform them of the results.

Shahan did not appear for a scheduled appointment at the clinic the next day, May 10. Nor did she otherwise contact the clinic after the May 9 ultrasound.

On May 13, Shahan was admitted to the labor and delivery department of the Hospital with premature rupture of membranes. A report by Dr. Ogata on that day makes no reference to any abnormalities or problems with the fetus. Two days later, Amanda was born.

At the time of the birth, the physicians had not yet received the report of the May 9 ultrasound. A "delivery note" by Dr. Gubin dated the day of the birth does not mention any problem with Amanda.

Amanda was born with brain abnormalities, including hydrocephalus ex-vacuole. These conditions could not have been prevented and could not have been treated or cured in utero. Prior to the birth, Shahan had not been informed of any problems with the fetus. She testified that she would have had an abortion if she had known that the fetus would be born with a "severe injury."

Dr. Gubin testified that he believed that in 1994 it was illegal to perform or recommend an abortion of a viable fetus. Because he believed that abortion

was illegal, as well as "immoral [and] unethical," he would not have recommended an abortion to anyone with a viable fetus. He further testified that regardless of when an ultrasound was performed that showed microcephaly or an abnormality, if the fetus was viable, he would have treated the patient and fetus in the same way: "Let the fetus continue to develop[,] and deliver and hope that the [radiologist's] findings were wrong . . . ."

At the time of trial, Amanda was eight years old. She is microcephalic, mentally retarded, and, according to a pediatric neurologist, "will always be a child under the age of one year." She suffers from cerebral palsy involving both sides of her body, has diminished vision, and is unable to walk, crawl, talk, communicate, or control elimination. She cannot chew, and is fed a liquid diet and medicine through a bottle and a gastrostomy tube. She will be dependent upon others for her care for the rest of her life.

## II. SUMMARY OF EXPERT TESTIMONY

Amanda presented the testimony of five experts. Roy Filly, M.D., testified that the March 21 ultrasound indicated that "there has been some form of maldevelopment of the central nervous system or potentially the spine, spinal cord." Although the ultrasound report did not "absolutely" indicate a birth defect, there was an 80 percent chance of an "anomaly." He opined that the fetus was not viable at this time. He would have scheduled followup ultrasounds at two-week intervals. The May 9 ultrasound indicated that the fetus was microcephalic, which usually results in "very profound mental retardation often associated with other things, blindness, deafness, spasticity, seizures."

Merle Robboy, M.D., testified that he performs abortions up to, but not beyond, 30 weeks' gestational age. He would have recommended or performed an abortion after the March 21 ultrasound if Shahan requested one. In his opinion, the applicable standard of care for the physicians required Shahan to be referred to a high-risk specialist or a perinatologist. He would have advised Shahan of the abnormalities indicated by the March 21 ultrasound and discussed the potential for an abortion.

Mary Dee Cutler, R.N., opined that Sterling's conduct as Shahan's case coordinator fell below the applicable standard of care in several respects, including her failure to inform Shahan of the potential defects apparent in the March 21 ultrasound, the failure to seek a referral to a specialist, the failure to ensure that a followup ultrasound was performed in a timely manner, and the failure to inform Shahan of her options. Cutler further opined that these failures and breaches of other duties owed to Shahan caused Amanda to be born. She based this opinion on her belief that if the mother had "different

information," she "may have made different decisions, which would have changed whether or not the pregnancy would have been terminated or allowed to continue."

Eugene Sollman, M.D., testified that the March 21 ultrasound shows an abnormal result indicating potential brain damage leading to mental retardation, blindness, or deafness. He opined that Dr. Gubin, Dr. Ogata, and Sterling acted below the applicable standards of care by, among other failures, failing to review the March 21 ultrasound report with Shahan, failure to ensure that a followup ultrasound was done on the next visit, and failing to inform Shahan of the results and potential risks disclosed by the March 21 ultrasound. Shahan, he stated, should have been referred to a specialist in March 1994 and told to go to a fetal diagnostic center. She should also have been told that she was entitled to terminate the pregnancy if she desired. Dr. Sollman further opined that Sterling and the Hospital breached their respective standards of care by failing to inform Shahan of the May 9 ultrasound. These failures, he concluded, were a substantial factor in bringing about Amanda's birth.

On cross-examination, Dr. Sollman was questioned about Sterling's March 22 "size vs dates" note. Dr. Sollman agreed that if Sterling was told to obtain a repeat ultrasound for the purpose of resolving the size versus dates question, "there would be nothing that would raise her eyebrows that there is a distinct problem." Nor was there anything in the medical records to show that the physician's original diagnosis concerning the pregnancy had changed, and in that situation, it would be appropriate for the nurse to continue to treat the patient under the original diagnosis. He further stated that the March 21 ultrasound indicated a potential problem, not a definitive finding.

Arthur Shorr, a consultant to health care providers, opined that the Hospital failed to implement rules, policies, regulations, and processes concerning the CPSP.

Defendants presented the testimony of two experts. Janice Kidwell is a nurse with experience in establishing a CPSP at another hospital. Kidwell testified that the Hospital complied with all requirements for operating such a program.

Manuel Porto, M.D., distinguished the duties of the physicians who provided the medical services for CPSP patients and the nurse who oversaw the support services of the CPSP. He explained that the physicians, not the CPSP staff, are responsible for making diagnoses, managing the medical care of the patient, referring patients to other physicians, interpreting ultrasound

reports, and determining whether another evaluation is needed. Sterling and other CPSP staff did not have the duty to interpret or discuss an ultrasound with the patient.

Dr. Porto testified that in 1994, viability of a fetus was considered to occur at approximately 24 weeks. With respect to a physician's treatment of a woman carrying a viable fetus during the third trimester of pregnancy, Dr. Porto stated that recommending or performing an abortion falls below the standard of care unless the pregnancy threatened the life of the mother or the fetus was certain to die. Specifically, the failure of a physician to give a patient the option of an abortion under such circumstances does not fall below the applicable standard of care. Instead of informing a patient of the option of terminating the pregnancy, the standard of care in that situation required the physician to inform the patient of problems and, depending on how serious the problems are, to formulate a plan for supportive care and management after the delivery.

According to Dr. Porto, as of the date of the March 21 ultrasound, the fetus was nearly one month past the age of viability. In his view, the March 21 ultrasound presented "an equivocal finding." It raised the possibility of different abnormalities with a "strong chance that this baby would be born completely normal and this problem would resolve itself." There could not be a definitive diagnosis at that time. Giving Shahan the option of terminating the pregnancy at that time without a definitive diagnosis, Dr. Porto testified, would have been below the physician's standard of care. Specifically, Dr. Gubin and Dr. Ogata each acted consistent with the standard of care in treating Shahan.

With respect to the May 9 ultrasound, Dr. Porto testified that the report showed evidence of microcephaly and a very strong possibility that the baby would be born severely impaired. However, the report did not indicate that the fetus would suffer a "lethal birth." Nor did the medical records indicate that Shahan had any physical or psychiatric condition that would support an abortion of a viable fetus. Dr. Porto testified that it did not matter that the May 9 ultrasound was performed seven weeks after the March 21 ultrasound, rather than between four and six weeks as the radiologist had recommended; at any time after the March 21 ultrasound, the fetus was at a viable gestational age.

On cross-examination, Dr. Porto testified that a third-trimester abortion was generally not available to Shahan in 1994. He knew of one location in California that performed third-trimester abortions, but did not know whether that center did so in 1994 or, if they did, whether Shahan would have been "a candidate for that place."

## III. ·PROCEDURAL HISTORY ·

In March 1998, Amanda, Shahan, and Ermoian filed the operative pleading in this case, a second amended complaint against the Hospital, Sterling, and Cribbs.[11] The pleading alleged three causes of action. The first cause of action, titled "professional negligence/wrongful life," is brought by Amanda, through Shahan as her guardian ad litem, and is asserted against each defendant. The second and third causes of action are for breach of written contract and promissory estoppel; these are asserted by Amanda, Shahan, and Ermoian against the Hospital.

In July 1998, defendants filed a motion for summary judgment, or, alternatively, summary adjudication of each cause of action. In August 1998, Amanda, Shahan, and Ermoian filed a motion for an order that the truth of certain facts be deemed admitted on the ground that defendants failed to timely respond to a request for admissions. The court denied the motion to deem facts admitted, and granted the motion for summary adjudication as to the second and third causes of action.[12] Thereafter, the court entered a judgment of dismissal as to the claims of Shahan and Ermoian. Shahan and Ermoian did not appeal from the judgment against them. They are not parties to this appeal.

The case proceeded to trial on the sole remaining claim for wrongful life. Prior to trial, the court ruled on certain motions in limine. Among these is a ruling, based upon Civil Code section 43.6, that Amanda was not required to produce evidence that Shahan "would have, if informed at the time she should have been informed of the genetic defect, obtained an abortion."[13] However, to prove the element of causation, the court ruled that Amanda must introduce testimony that at the time Shahan should have been informed of the abnormalities in the fetus, an abortion was available to her as a choice. The court explained, "at that point in time, there had to be something to choose between, either not having an abortion or having an abortion. [¶] And

---

[11] Drs. Gubin and Ogata are not parties in this case. Amanda sued the physicians in a prior action, which settled before trial.

[12] Amanda filed with this court a petition for a writ of mandate to compel the trial court to set aside the order denying the motion to deem facts admitted. In September 1998, we summarily denied the petition.

[13] Civil Code section 43.6, subdivision (b), provides: "The failure or refusal of a parent to prevent the live birth of his or her child shall not be a defense in any action against a third party, nor shall the failure or refusal be considered in awarding damages in any such action." The court also ruled that this statute prohibited evidence by the defense to show that even if the mother knew of the birth defects during the pregnancy she would not have had an abortion. The court's ruling on this issue is not challenged on appeal and we express no view as to its correctness.

Notwithstanding this ruling, Shahan did testify that she would have had an abortion if she had known that the fetus would be born with a "severe injury."

if at that point in time there was no place on the earth that you could obtain an abortion, then I don't think you've met the elements of the particular cause of action. So I think it's an element that you have to introduce testimony that at the time [Shahan] should have been informed, there was still a choice to be made as to whether she could or couldn't have an abortion." Amanda "would need to have a doctor testify that he has reviewed the medical records, reviewed the issues related to the mother, and at the time the mother should have been informed of the defect, or whatever it was that would have necessitated the choice, that he or she would have performed an abortion."[14]

With respect to proof of the availability of an abortion, the court addressed the legality of late-term abortions in California at the time of Shahan's pregnancy.[15] The court ruled that, in 1994, California law prohibited an abortion of a viable fetus unless it was necessary to protect the health or safety of the mother. Therefore, if the testifying physician is from California, the availability of an abortion would necessarily involve issues concerning the viability of the fetus and the health and safety of the mother. These issues, the court ruled, would be questions for the trier of fact. The court did not

---

[14] Amanda filed with this court a petition for a writ of mandate to compel the trial court to vacate and set aside these rulings. We summarily denied the petition in March 1999. In the present appeal, we granted Amanda's request to take judicial notice of the documents filed in connection with this petition.

[15] At the time of Shahan's pregnancy, the 1967 Therapeutic Abortion Act prohibited abortions after the 20th week of pregnancy. (Health & Saf. Code, former § 25953; *People v. Barksdale* (1972) 8 Cal.3d 320, 334–335 [105 Cal.Rptr. 1, 503 P.2d 257].) The statute did not include any exception for nonviable fetuses or pregnancies that endanger the life or health of the mother. In 1972, the California Supreme Court indicated in dicta that this absolute proscription conflicted with the right of a pregnant woman in California to terminate a pregnancy when the birth of the child would probably cause the woman's death. (*Barksdale, supra,* at p. 335 (dicta), citing *People v. Belous* (1969) 71 Cal.2d 954, 969 [80 Cal.Rptr. 354, 458 P.2d 194].) The validity of the restriction was placed in further doubt following the United States Supreme Court decision in *Roe v. Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705], which held that a woman has a fundamental, but qualified, right to decide whether to terminate a pregnancy. (*Id.* at p. 154.) Under *Roe,* a state "may go so far as to proscribe abortion" only after the time the fetus becomes viable, except when necessary to preserve the life or health of the mother. (*Id.* at pp. 163–164.) Fetal viability, the court subsequently stated, "essentially is a medical concept," and the Legislature may not place it "at a specific point in the gestation period." (*Planned Parenthood of Missouri v. Danforth* (1976) 428 U.S. 52, 64 [49 L.Ed.2d 788, 96 S.Ct. 2831].) In light of these and other authorities, the California Attorney General opined in 1982 that the absolute proscription of abortions after the 20th week "exceeds constitutional limits"; however, the Attorney General concluded that the provision need not be invalidated in its entirety, but should be construed as "constitutionally enforceable except as to abortions of nonviable fetuses and abortions necessary to preserve the life or health of the mother." (65 Ops.Cal.Atty.Gen. 261, 265, 267 (1982); see also 74 Ops.Cal.Atty.Gen. 101, 104–106 (1991) [the provision should be construed to prohibit abortions after the fetus becomes viable, except to preserve the life or health of the mother].) As of 1994, no court had specifically addressed the constitutionality of the provision in any reported decision. The statute was repealed in 1995, the year after Amanda was born. (See Stats. 1995, ch. 415, § 161, p. 3335.)

preclude Amanda from introducing the testimony of a physician who would have performed an abortion in another state or foreign country with less restrictive abortion regulations.

The case was tried by the court in 2003. During the trial, the court granted Cribbs's motion for judgment and dismissed her from the action. Amanda does not challenge this ruling.

Following trial, the court found for defendants. The court issued a statement of decision stating: "[Amanda's] medical condition did not result from negligent care or treatment of any defendant. . . . [¶] Drs. Gubin and Ogata are not defendants in this case. Drs. Gubin and Ogata were independent contractors of the [H]ospital. Since they are not employees of the [H]ospital, the [H]ospital is not vicariously liable for their conduct under the theory of responde[a]t superior. [¶] Based upon the evidence presented at trial, an elective abortion is not recommended as a treatment alternative after the twentieth (20th) week of gestation (unless the health of the mother is at substantial risk). Failing to offer an abortion as a treatment alternative cannot fall below the standard of care if, as here, the evidence showed that the fetus was beyond the twenty (20) week gestation and the mother's health was not at substantial risk. The evidence showed that the treating physician would not have recommended an elective abortion as an alternative following a second ultrasound. [¶] Therefore, the court finds as follows: [¶] [Amanda] did not meet her burden of proving her cause of action for wrongful life. The [H]ospital is not vicariously liable for actions of Drs. Ogata and Gubin. The [H]ospital and Nurse Sterling did not act negligently in failing to advise Ms. Sha[h]an. Nurse Sterling's failure to schedule a follow-up ultrasound did not proximately cause any damages."

## IV. ANALYSIS

### A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. *Sufficiency of the Evidence Supporting the Judgment*

■ A child can assert a cause of action for medical malpractice resulting in the child's "wrongful life." (*Turpin v. Sortini* (1982) 31 Cal.3d 220, 239 [182 Cal.Rptr. 337, 643 P.2d 954].) "The essence of the child's claim is that the medical professional's breach of the applicable standard of care resulted in that child being *born* to experience the pain and suffering attributable to

---

* See footnote, *ante,* page 475.

his or her affliction." (*Hegyes v. Unjian Enterprises, Inc.* (1991) 234 Cal.App.3d 1103, 1112 [286 Cal.Rptr. 85]; see also *Gami v. Mullikin Medical Center* (1993) 18 Cal.App.4th 870, 877 [22 Cal.Rptr.2d 819] ["The gravamen of the action is that a child afflicted with a genetic defect 'alleges that but for the defendant's negligence he or she would not have been born and thus would not have had to suffer the defect' "].)[20]

Wrongful life is a form of a medical malpractice action. (*Galvez v. Frields* (2001) 88 Cal.App.4th 1410, 1420 [107 Cal.Rptr.2d 50].) " 'As in ordinary medical malpractice cases, the plaintiffs in a wrongful life . . . case must establish the following basic elements: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." [Citations.]' " (*Ibid.*; see also *Gami v. Mullikin Medical Center, supra,* 18 Cal.App.4th at p. 877.)[21]

The "resulting injury" in a wrongful life action is not the plaintiff's disease or birth defects, but the birth of the plaintiff with the defect. (*Curlender v. Bio-Science Laboratories* (1980) 106 Cal.App.3d 811, 828–829 [165 Cal.Rptr. 477].) In essence, injury occurs when never being born, or nonexistence, is preferable to existence in the plaintiff's diseased state. (*Turpin v. Sortini, supra,* 31 Cal.3d at p. 232.) There is no dispute in this case as to whether Amanda has suffered such an injury for purposes of a wrongful life claim. The parties did dispute issues of duty, negligence, and causation.

The trial court found that Amanda failed to meet her burden of proof of establishing her cause of action for wrongful life. This conclusion is based, at

---

[20] Courts have distinguished the cause of action for "wrongful life" from a cause of action for "wrongful birth." The former is brought by the child, who alleges " 'that due to the negligence of the defendant, birth occurred . . .' [citation]"; the latter is brought by the parents seeking damages for the birth of the child. (*Gami v. Mullikin Medical Center, supra,* 18 Cal.App.4th at p. 877 & fn. 11; see also *Turpin v. Sortini, supra,* 31 Cal.3d at p. 225 & fn. 4; *Hegyes v. Unjian Enterprises, Inc., supra,* 234 Cal.App.3d at p. 1112; Annot., Tort Liability for Wrongfully Causing One to Be Born (1978) 83 A.L.R.3d 15, 19, fns. 3, 4.)

[21] BAJI No. 6.08 provides: "The essential elements of this claim are: [¶] 1. The defendant negligently [counseled] [tested] [and] [treated] the [mother] [parents] [_____] of the [(name of child)] concerning genetic defects and disabilities; [¶] 2. The negligent [counseling] [testing] [and] [treating] caused the [mother] [parents] to be unaware of the possibility of this [hereditary] condition thereby depriving [her] [him] [them] [of the opportunity to choose not to conceive a child with a genetic or congenital defect] [of the opportunity of making an informed decision on whether to have a eugenic abortion][;] [¶] 3. The defendant's negligence was a cause of the child _____ being born; [¶] 4. The child _____ was born with a [congenital] [genetic] [ailment] [defect] [namely, _____ ]; and [¶] 5. The [plaintiff] [child] [parents] thereby sustained special damages."

least in part, upon the express findings that defendants are not employees of the Hospital and, therefore, not vicariously liable for the conduct of Drs. Gubin and Ogata; the Hospital and Sterling "did not act negligently" in failing to advise Shahan; and Sterling's failure to schedule a followup ultrasound did not proximately cause any damages. The court's statement of decision did not expressly address certain factual issues, including issues concerning alleged negligent noncompliance with statutory or regulatory duties, Sterling's alleged negligence for failing to schedule an ultrasound for the March 29 visit, and (if the Hospital is vicariously liable for the conduct of the doctors) the physician's negligence for failing to inform Shahan of problems with the fetus. Because of the absence of express findings on these issues, we must first consider whether we can infer findings favorable to the judgment on such issues under the doctrine of implied findings.

### 1. *Application of the Doctrine of Implied Findings*

■ Ordinarily, when the court's statement of decision is ambiguous or omits material factual findings, a reviewing court is required to infer any factual findings necessary to support the judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227] (*Arceneaux*); *SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462 [17 Cal.Rptr.3d 96].) This rule "is a natural and logical corollary to three fundamental principles of appellate review: (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error." (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 58 [58 Cal.Rptr.3d 225] (*Fladeboe*).)

In order to avoid the application of this doctrine of implied findings, an appellant must take two steps. First, the appellant must request a statement of decision pursuant to Code of Civil Procedure section 632 (all further references are to the Code of Civil Procedure unless otherwise indicated); second, if the trial court issues a statement of decision, "a party claiming omissions or ambiguities in the factual findings must bring the omissions or ambiguities to the trial court's attention" pursuant to section 634. (*Fladeboe, supra,* 150 Cal.App.4th at pp. 59–60.)

Section 634 provides: "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court either prior to entry of judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on appeal or upon a motion under Section 657 or 663 that the trial court decided in favor of the prevailing party as to those facts or on that issue." Amanda did not file a motion for new trial under

section 657 or a motion to set aside the judgment under section 663. Therefore, Amanda's compliance with section 634 depends upon whether she brought the alleged deficiencies in the statement of decision "to the attention of the trial court . . . prior to entry of judgment." Section 634 "does not specify the particular means that the party may use to direct the court's attention to the claimed defects in the statement." (*Arceneaux, supra,* 51 Cal.3d at p. 1134.)

The parties' briefs do not address the issue of whether Amanda brought any omissions or ambiguities to the attention of the court for purposes of the doctrine of implied findings. We therefore requested supplemental briefing from the parties to address this issue.[22]

### (a) *Relevant Procedural History*

Following trial, the court issued a minute order stating its "verdict" in favor of defendants and against Amanda, Shahan, and Ermoian. Amanda thereafter filed a request for statement of decision pursuant to section 632, setting forth 92 paragraphs of purported controverted issues. The court then ordered the defendants "to prepare a tentative statement of decision." Defendants did so, submitting a "[PROPOSED] STATEMENT OF DECISION." This seven-page document includes discussion of the law and evidence (or lack of evidence) under the following headings: "THE HOSPITAL IS NOT VICARIOUSLY LIABLE FOR ACTIONS OF DRS. OGATA OR GUBIN"; "THE HOSPITAL AND NURSE STERLING DID NOT ACT NEGLIGENTLY IN FAILING TO ADVISE MS. SHAHAN"; "AN ABORTION WAS NOT AN OPTION AVAILABLE TO PLAINTIFF'S MOTHER"; and "NURSE STERLING'S FAILURE TO SCHEDULE A FOLLOW-UP ULTRASOUND DID NOT PROXIMATELY CAUSE ANY DAMAGES."

The day after defendants' proposed statement of decision was submitted, Amanda filed a document titled, "PLAINTIFF'S PROPOSAL FOR STATEMENT OF DECISION AND OBJECTION TO DEFENDANTS' PROPOSED

---

[22] Our order for supplemental briefing requested briefing on these issues: (1) whether, for purposes of section 632 and the doctrine of implied findings (see *Arceneaux, supra,* 51 Cal.3d at pp. 1133–1134; *SFPP v. Burlington Northern & Santa Fe Ry. Co., supra,* 121 Cal.App.4th at p. 462), plaintiff brought to the attention of the trial court any omission or ambiguity in the trial court's statement of decision; and (2) whether the document titled, "PLAINTIFF'S PROPOSAL FOR STATEMENT OF DECISION AND OBJECTION TO DEFENDANTS' PROPOSED STATEMENT OF DECISION," filed by plaintiff is sufficient to bring to the attention of the trial court any omission or ambiguity in the trial court's statement of decision within the meaning of section 634 and the doctrine of implied findings. (See *Bay World Trading, Ltd. v. Nebraska Beef, Inc.* (2002) 101 Cal.App.4th 135, 141 [123 Cal.Rptr.2d 632]; *Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380 [25 Cal.Rptr.2d 242].)

STATEMENT OF DECISION." We will refer to this document as the "Proposal and Objection." The text of this document is discussed below.[23]

Thereafter, the court filed its statement of decision, the text of which is set forth at page 492, *ante.*

Following the issuance of the statement of decision, but prior to the entry of judgment, Amanda filed a notice of appeal. Amanda subsequently filed a notice designating the reporter's transcript on appeal and designation of issues pursuant to rule 4 of the California Rules of Court.[24] We will refer to this document as the "Rule 4 Notice."

Because the notice of appeal was filed before the entry of judgment, we dismissed Amanda's appeal as premature, without prejudice to reinstating the appeal upon proof of entry of judgment. Following the entry of judgment, we granted Amanda's motion to vacate the order of dismissal and reinstate the appeal.

(b) *Analysis*

In her supplemental brief, Amanda contends that she brought the deficiencies in the statement of decision to the attention of the court when she filed (1) the Rule 4 Notice and (2) her Proposal and Objection.

■ The Rule 4 Notice sets forth a procedure for the preparation of the reporter's transcript on appeal. Under this rule, the appellant must, within 10 days after a notice of appeal, file either a notice designating a reporter's transcript or a notice of intent to proceed without a reporter's transcript (unless proceeding by an agreed statement or settled statement). (Rule 4(a)(1).) The court clerk is responsible for sending the notice to the reviewing court and the court reporter. (Rule 4(d).) Of particular relevance here is rule 4(a)(5), which requires an appellant who designates a transcript of less than all of the oral proceedings to "state the points to be raised on appeal."

---

[23] Concurrent with the filing of the supplemental letter brief, Amanda submitted a request to augment the record with (1) a document filed in the superior court on July 12, 2004, titled, "DEFENDANTS' RESPONSE TO PLAINTIFF'S PROPOSAL FOR STATEMENT OF DECISION AND OBJECTION TO DEFENDANTS' PROPOSED STATEMENT OF DECISION" (Defendants' Response to Proposal and Objection), and (2) a facsimile cover sheet purporting to show that the Proposal and Objection was faxed to the court on June 28, 2004. By separate order, we granted the request to augment as to the Defendants' Response to Proposal and Objection, and denied the request as to the facsimile cover sheet.

[24] All further references to rules are to the California Rules of Court. Effective January 1, 2007, rule 4 has been renumbered rule 8.130. We will refer to this rule by the former rule number.

Amanda's Rule 4 Notice was filed after she filed her notice of appeal. It is expressly directed only to the parties, their attorneys, and the clerk of the superior court. Pursuant to rule 4, the document designates certain oral proceedings to be transcribed for the appeal and certain points to be raised on appeal.

Ordinarily, it would be frivolous to assert that a notice filed pursuant to rule 4 could bring deficiencies in a statement of decision to the attention of the trial court for purposes of section 634. Section 634 requires that any deficiencies be brought to the attention of the trial court "prior to entry of judgment." Because the designation of the reporter's transcript must be filed after the filing of the notice of appeal, which itself must generally be filed after the entry of judgment, a notice under rule 4 could not properly be filed before the entry of judgment. It could not, therefore, bring any deficiency to the attention of the trial court *prior to* the entry of judgment.

Here, Amanda improperly filed her notice of appeal and Rule 4 Notice prior to the entry of judgment. This apparently fortuitous mistake on her part does not help her. Despite being filed before the entry of judgment, Amanda's Rule 4 Notice cannot be viewed as effectively bringing any deficiencies in the statement of decision to the attention of the court. The purposes of a notice filed pursuant to rule 4 are to inform the court reporter which portions of the oral proceedings to transcribe, to·limit the scope of appellate review to the issues specified, and to enable the respondent on appeal to determine whether to request that additional portions of the oral proceedings be transcribed. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2006) ¶¶ 4:80 to 4:80.1, p. 4-19 (rev. # 1, 2006).) There is nothing in the rule that suggests that the trial judge would ever see such a notice, let alone be expected to take any action based upon it. Nor does Amanda request any relief or action from the trial court in the document; she merely designates oral proceedings to be transcribed and points to be raised on appeal. Although the document is filed with the superior court, this is so the court clerk can direct the document to the reporter and send a copy to the reviewing court. (Rule 4(d).) Regardless of its content, therefore, Amanda's Rule 4 Notice could not have brought to the attention of the trial court any deficiencies in the statement of decision.

Other than the Rule 4 Notice, Amanda filed nothing after the court issued its statement of decision that would arguably bring any omissions or ambiguities in that document to the court's attention. Amanda contends, however, that her Proposal and Objections, filed in response to defendants' *proposed* statement of decision, satisfied the requirements of section 634 or rendered any objection to the final statement futile. Even if we assume that objections to a proposed statement of decision may satisfy section 634 or render

objections to a final statement of decision futile, we hold that Amanda's Proposal and Objection did not effectively bring the deficiencies in the proposed statement of decision to the attention of the trial court.

■ To bring defects in a statement of decision to the trial court's attention within the meaning of section 634, objections to a statement of decision must be "specific." (*Golden Eagle Ins. Co. v. Foremost Ins. Co., supra*, 20 Cal.App.4th at p. 1380.) The alleged omission or ambiguity must be identified with sufficient particularity to allow the trial court to correct the defect. (See *Arceneaux, supra*, 51 Cal.3d at p. 1138.) "By filing specific objections to the court's statement of decision a party pinpoints alleged deficiencies in the statement and allows the court to focus on the facts or issues the party contends were not resolved or whose resolution is ambiguous." (*Golden Eagle Ins. Co. v. Foremost Ins. Co., supra*, at p. 1380.)

Amanda's Proposal and Objection consists of two paragraphs. The first paragraph states: "Plaintiff objects to the proposed Statement of Decision filed herein by Defendants, on the grounds that: a) the proposed Statement does not comply with . . . Section 632; b) the proposed Statement does not provide the Court's 'explanation' for its decision as to each controverted issue which was specified by Plaintiff in Plaintiff's Request for Statement of Decision filed herein, c) the Proposed Statement is factually and legally incorrect and inaccurate; d) the proposed Statement fails to accurately identify the matters that were actually proved at Trial; [e]) the proposed Statement does not accurately specify the applicable law in this case; [f]) the proposed Statement is not supported by the facts and evidence proved at Trial."

These objections express a generalized disagreement with the whole of the proposed statement of decision. They fall far short of the kind of specific objections required to pinpoint alleged deficiencies in the statement of decision. They do not focus the court on any particular omission or ambiguity in the statement and provide the court with no meaningful guidance as to how to correct any particular defect.

The second paragraph of the Proposal and Objection states: "Pursuant to . . . Section 632, Plaintiff respectfully proposes that this Court reject Defendants' proposed Statement of Decision in its entirety, and that the Court issue **its own** Statement of Decision **that is drafted entirely by the Court**, with respect to this Court's Minute Order of March 26, 2004, granting a Verdict for Defendants, Desert Hospital and Maria Sterling and against Plaintiff. Plaintiff respectfully proposes that the Court's Statement of Decision be drafted entirely by the Court, and that the Court's Statement specifically **'explain' the 'factual and legal basis for its decision as to each of the**

**principal controverted issues at Trial'**, as specified in detail by Plaintiff in Plaintiff's <u>Request for Statement of Decision</u> filed herein. Since Plaintiff's substantial rights are involved in this case, and Plaintiff will appeal this Court's Judgment in favor of Defendants, due process, fundamental fairness, and . . . Section 632 requires the Court to provide the Plaintiff with **its own** 'explanation' of the factual and legal basis for its decision, as to each controverted issue in this action, in full compliance with . . . Section 632."

In this paragraph Amanda requests, in essence, that the court reject defendants' proposed statement of decision in its entirety and draft its own statement of decision explaining the factual and legal basis for its decision as to each of the issues specified in Amanda's prior requests. Significantly, this request is based upon section 632 and makes no reference to section 634. Section 632 permits a party to request a statement of decision. A request made pursuant to this section is merely the *first* step in the two-step process necessary to avoid the doctrine of implied findings. (*Arceneaux, supra,* 51 Cal.3d at p. 1134; *Fladeboe, supra,* 150 Cal.App.4th at pp. 59–60.) By requesting that the court prepare a statement of decision that explains each of her previously identified "controverted issues," Amanda is simply reiterating her initial request for a statement of decision. Taking the first step in the process a second time does not mean that you have completed the second step.

Read in its entirety, Amanda's Proposal and Objection asserts general, nonspecific objections to defendants' proposed statement of decision to support her request that the court prepare its own statement of decision. The overly broad objections and the request to, in effect, start over, do not comply with section 634. The document does not "pinpoint" any alleged omissions or ambiguities and does nothing to focus the court on the facts and issues necessary to correct any such deficiencies.[25]

Even if we construe the Proposal and Objection as an assertion that the 92 paragraphs of issues in Amanda's initial request for statement of decision are omissions or ambiguities in the statement of decision, the Proposal and Objection is still ineffective. While it is clear that Amanda was displeased with the proposed statement of decision, the incorporation of the previously asserted 92 paragraphs of issues into the Proposal and Objection did not focus the court on any particular omissions or ambiguities in the proposed statement of decision; it merely reasserts, in a scattershot fashion, the same alleged issues. If the court was required to address each of the issues set forth in the 92 paragraphs, Amanda's reassertion of the same issues could be

---

[25] Defendants' Response to Proposal and Objection (see, *ante,* fn. 23) does nothing to alter our interpretation of Amanda's Proposal and Objection or affect our analysis.

viewed as effectively pointing out that the requirement was not met. However, a trial court is not required to respond point by point to issues posed in a request for a statement of decision. " 'The court's statement of decision is sufficient if it fairly discloses the court's determination as to the ultimate facts and material issues in the case.' (*Golden Eagle Ins. Co. v. Foremost Ins. Co.[, supra,]* 20 Cal.App.4th [at p.] 1380 . . . ; see also *Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1118 [54 Cal.Rptr.2d 377] [trial court 'is not required to make an express finding of fact on every factual matter controverted at trial, where the statement of decision sufficiently disposes of all the basic issues in the case']; *In re Marriage of Garrity & Bishton* (1986) 181 Cal.App.3d 675, 686–687 [226 Cal.Rptr. 485] [trial court's statement of decision is required only to state ultimate rather than evidentiary facts].)" (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 736–737, fn. 15 [43 Cal.Rptr.3d 181].) Thus, the proposed statement of decision is not necessarily deficient merely because it does not address each of the issues identified in Amanda's 92 paragraphs.

Here (in addition to the causation and damages issues), the ultimate issues were (1) whether Sterling or Hospital staff owed a duty to inform and advise Shahan of the ultrasound results and the abnormalities in the fetus or refer her to a specialist, and if so, whether they breached such duties; (2) whether Sterling or Hospital staff breached any duty to schedule ultrasounds; (3) whether the physicians owed a duty to Shahan to diagnose the fetus's abnormal condition, inform Shahan of such condition, and advise Shahan of treatment options, including abortion, or refer Shahan to another treating physician, and, if so, whether they breached such duties; and (4) whether the Hospital was vicariously liable for any negligence of the physicians, based on either actual or ostensible agency. To the extent the statement of decision was deficient in failing to address any of these issues, Amanda's redundant request to address 92 paragraphs of purported issues simply failed to focus the court's attention on any such deficiencies. Instead it amounted to a laundry list of alleged issues, most of which were subsumed in the proposed statement of decision.

Because neither the Rule 4 Notice nor the Proposal and Objection effectively brought to the attention of the trial court any omissions or ambiguities in the final or proposed statements of decision, we will apply the doctrine of implied findings.

2. *Standard of Review*

Amanda argues that we must review the court's findings concerning negligence and causation de novo. We reject this contention. In both jury and nonjury trials, factual findings made by the trier of fact are generally

reviewed for substantial evidence. (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1489 [21 Cal.Rptr.3d 36]; *Alderson v. Alderson* (1986) 180 Cal.App.3d 450, 465 [225 Cal.Rptr. 610].) Factual issues may be reviewed de novo when the facts are uncontroverted and only one deduction or inference may reasonably be drawn. (*Fagerquist v. Western Sun Aviation, Inc.* (1987) 191 Cal.App.3d 709, 719 [236 Cal.Rptr. 633].) Here, however, essential facts were controverted or permitted conflicting inferences. Sterling's March 22 note to "repeat ultrasound next visit," for example, is viewed by Amanda as an order by Dr. Ogata to Sterling to obtain an ultrasound, which Sterling then negligently failed to perform; Sterling, however, explained that the note reflects a recommendation, and that the treating physician on March 29 did not require, and did not order, the ultrasound in light of the information about the gestational age available to the physician at that time. There were also widely conflicting views among the opposing expert witnesses as to the nature and scope of the applicable standards of care and whether the standards were breached. Accordingly, de novo review of the court's findings is inappropriate in this case.

Under the substantial evidence standard of review, our review begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the trial court's factual determinations. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 [197 Cal.Rptr. 925]; *Piedra v. Dugan, supra*, 123 Cal.App.4th at p. 1489.) Substantial evidence is evidence of ponderable legal significance, reasonable in nature, credible, and of solid value. (*Bowers v. Bernards, supra*, at p. 873.) The substantial evidence standard of review applies to both express and implied findings of fact made by the court in its statement of decision. (*SFPP v. Burlington Northern & Santa Fe Ry. Co., supra*, 121 Cal.App.4th at p. 462.)

### 3. *Vicarious Liability of the Hospital for Negligence by Dr. Gubin or Dr. Ogata*

The Hospital, as an entity that is not a natural person, cannot practice medicine. (Bus. & Prof. Code, §§ 2032, 2022; *Lathrop v. HealthCare Partners Medical Group* (2004) 114 Cal.App.4th 1412, 1420 [8 Cal.Rptr.3d 668].) Its liability for medical malpractice (including malpractice resulting in a plaintiff's wrongful life), therefore, must be based upon a theory of vicarious liability. (*Quintal v. Laurel Grove Hospital* (1964) 62 Cal.2d 154, 166 [41 Cal.Rptr. 577, 397 P.2d 161] (*Quintal*).) Amanda contends, as she did below, that she established such liability because Drs. Gubin and Ogata were the actual or ostensible agents of the Hospital as a matter of law. The trial court disagreed, expressly finding that the Hospital was not vicariously liable for the actions of the physicians.

■   Whether a physician is an agent of a hospital for purposes of vicarious liability is a question of fact. (*Stanhope v. L. A. Coll. of Chiropractic* (1942) 54 Cal.App.2d 141, 146 [128 P.2d 705] (*Stanhope*); *Mejia v. Community Hospital of San Bernardino* (2002) 99 Cal.App.4th 1448, 1457 [122 Cal.Rptr.2d 233] (*Mejia*).) As explained above, we review the trial court's finding on this issue under the substantial evidence standard.

Agency may be either actual or ostensible. (Civ. Code, § 2298; *Vallely Investments v. BancAmerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 826 [106 Cal.Rptr.2d 689].) Actual agency exists "when the agent is really employed by the principal." (Civ. Code, § 2299.) Here, there was evidence that the physicians were not employees of the Hospital, but were physicians with a private practice who contracted with the Hospital to perform obstetric services at the clinic. The written contract between the Hospital and Dr. Gubin's corporation (which employed Dr. Ogata) describes Dr. Gubin and his corporation as "independent contractors with, and not as employees of, [the] Hospital." Sterling testified that Drs. Gubin and Ogata, *not the Hospital*, provided the obstetric services to the clinic's patients. Donna McCloudy, a director of nursing at the Hospital, testified that while the Hospital provided some aspects of the CPSP services, "independent physicians came in and provided the obstetrical care . . . ." Based upon such evidence, the court reasonably concluded that the physicians were not the employees or actual agents of the Hospital for purposes of vicarious liability.

■   Ostensible agency on the other hand, " 'may be implied from the facts of a particular case, and if a principal by his acts has led others to believe that he has conferred authority upon an agent, he cannot be heard to assert, as against third parties who have relied thereon in good faith, that he did not intend to confer such power . . . .' " (*Tomerlin v. Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 644 [39 Cal.Rptr. 731, 394 P.2d 571].) "The doctrine establishing the principles of liability for the acts of an ostensible agent rests on the doctrine of estoppel [citation]. The essential elements are representations by the principal, justifiable reliance thereon by a third party, and change of position or injury resulting from such reliance [citation]. Before recovery can be had against the principal for the acts of an ostensible agent, the person dealing with an agent must do so with belief in the agent's authority and this belief must be a reasonable one. Such belief must be generated by some act or neglect by the principal sought to be charged and the person relying on the agent's apparent authority must not be guilty of neglect [citation]." (*Hartong v. Partake, Inc.* (1968) 266 Cal.App.2d 942, 960 [72 Cal.Rptr. 722].)

■   " 'An agent's authority may be proved by circumstantial evidence.' " (*Tomerlin v. Canadian Indemnity Co., supra,* 61 Cal.2d at p. 644.) The burden

of proving ostensible agency is upon the party asserting that relationship. (*Oswald Machine & Equipment, Inc. v. Yip* (1992) 10 Cal.App.4th 1238, 1247 [13 Cal.Rptr.2d 193]; *Aspen Pictures, Inc. v. Oceanic S. S. Co.* (1957) 148 Cal.App.2d 238, 253 [306 P.2d 933]; *Hill v. Citizens Nat. Trust & Sav. Bk.* (1937) 9 Cal.2d 172, 177 [69 P.2d 853].) Relative to the relationship between a hospital and doctor, the elements of ostensible agency were first addressed in California in *Stanhope, supra,* 54 Cal.App.2d 141. There, the plaintiff sustained a broken back while moving a water heater at home. A friend transported him to the Los Angeles College of Chiropractic. (*Id.* at pp. 142–143.) The plaintiff had had no prior contact with the institution. An examining doctor referred the plaintiff for X-rays. The X-ray laboratory was located on the ground floor of the building that the college occupied. Dr. Joyant interpreted the X-rays as normal. Approximately one week later, further X-rays taken at the General Hospital were interpreted as showing a compression fracture of the 12th dorsal vertebra. In the ensuing malpractice action against the college, plaintiff contended that Dr. Joyant, the doctor interpreting the X-rays, was an employee or agent of the college. Evidence indicated that while the X-ray lab was on the first floor of the building occupied by the college, it was in fact separate from the college. Dr. Joyant owned the laboratory and all of the equipment therein. The laboratory's name was Los Angeles X-Ray Laboratory. This name appeared on the front window of the lab in conjunction with Dr. Joyant's name. The college and the doctor had a relationship where, in exchange for the doctor paying no rent or janitorial costs, he would teach at the college and do work on the college's patients. (*Id.* at pp. 144–145.) He would however, charge and collect the fees for individuals he treated, whether referred by the college or not. He did not share any of his fees with the college. The agreement between Dr. Joyant and the college was oral. The plaintiff testified that he was carried into the X-ray lab after his initial examination. Upon leaving, Dr. Joyant told him the charge would be $15, but given the connection between the plaintiff's friend and the college, the bill would be cut in two with the plaintiff owing $7.50. The plaintiff testified that he did not know who to pay. (*Id.* at p. 146.)

In finding this evidence sufficient to support the jury's implied finding of ostensible agency, the court stated that, " 'before a recovery can be had against a principal for the alleged acts of an ostensible agent, three things must be proved, to-wit:' [citation] '[First] [t]he person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one; [second] such belief must be generated by some act or neglect of the principal sought to be charged; [third] and the third person in relying on the agent's apparent authority must not be guilty of negligence. [Citations.]' [¶] An examination of the evidence hereinbefore referred to . . . met the requirements enumerated . . . . [T]he record reveals [defendant] did nothing to put [plaintiff] on notice that the X-ray laboratory was not an

integral part of [defendant] institution, and it cannot seriously be contended that [plaintiff], when he was being carried from room to room suffering excruciating pain, should have inquired whether the individual doctors who examined him were employees of the college or were independent contractors. . . . The evidence produced on this issue is sufficient to support the jury's implied finding that Dr. Joyant was the ostensible agent of [defendant] college." (*Stanhope, supra*, 54 Cal.App.2d at p. 146.)

*Stanhope* was subsequently relied on by the court in *Seneris v. Haas* (1955) 45 Cal.2d 811 [291 P.2d 915] (*Seneris*). There, plaintiff was admitted to the hospital as a "routine obstetrical case." (*Id.* at pp. 815–816.) Following her awakening after childbirth she complained that she could not move her lower extremities and had pain in numerous locations. Plaintiff subsequently sued her obstetrician, the anesthesiologist, and the hospital. Relative to the anesthesiologist, she contended that the hospital was responsible for his negligence under respondeat superior. In reversing the trial court's grant of nonsuit, the court quoted from *Stanhope* relative to the elements of ostensible agency. (*Seneris, supra*, at p. 831.) The court then explained: "Plaintiffs . . . showed that defendant West was one of six anesthetists on defendant hospital's panel, or staff; that he gave anesthetics for no other hospital; that all drugs and equipment used by him were supplied by said hospital; that he had regular 'on call' duty at said hospital; that a hospital nurse summoned him to give the anesthetic in question. It appears that this evidence is sufficient to establish, prima facie, that defendant West was an agent of defendant hospital. There is nothing in the record to show that plaintiffs should have been on notice that defendant West was not an employee of defendant hospital and it can not be 'seriously contended' that she was obliged to inquire whether each person who attended her in said hospital was an employee or an independent contractor. It follows that the trial court erred in taking the issue of agency from the jury." (*Id.* at p. 832.)

Later, in *Quintal, supra*, 62 Cal.2d 154, the court again dealt with the relationship of an independent contractor anesthesiologist and a hospital. "The hospital . . . furnished the nurses who attended [plaintiff], and the operating room nurses. It also furnished all equipment used by the anesthesiologist, including the anesthetic. [¶] When the mother of [plaintiff] brought him to the hospital . . . she was required by the hospital officials to sign an 'Authority to Operate,' authorizing the physician in charge of [plaintiff] 'to administer such treatment and the surgeon to have administered such anesthetics as found necessary and to perform the' eye operation. This document was not only secured by hospital employees, but was witnessed by two employees of the hospital. [¶] This evidence presented a question of fact to the jury." (*Id.* at p. 167.)

■    While both *Seneris* and *Quintal* deal with the issue of ostensible agency at a different procedural stage than *Stanhope*, there is nonetheless consistency as to requirements for finding ostensible agency within the medical context: (1) the service of the physician is performed on what appears to be the hospital's premises; (2) a reasonable person in the plaintiff's position would believe that the physician's services are part and parcel of services provided by a hospital; and (3) the hospital does nothing to dispel this belief.

More recently, in *Mejia, supra,* 99 Cal.App.4th 1448, this court, in reversing the grant of nonsuit on the issue of ostensible agency of a radiologist, held that "absent evidence that plaintiff should have known that the radiologist was not an agent of [defendant] hospital, plaintiff has alleged sufficient evidence to get to the jury merely by claiming that she sought treatment at the hospital." (*Id.* at p. 1460.) Simply stated, this court, consistent with *Stanhope, Seneris,* and *Quintal,* found that the plaintiff made a sufficient showing of ostensible agency because (1) she went to the hospital wherein she received an X-ray (read by a radiologist, the purported ostensible agent); (2) "it is commonly believed that hospitals are the actual providers of care . . . whenever someone seeks treatment at a hospital" (*Mejia, supra,* at p. 1456); and (3) there is an "absen[ce of] evidence that plaintiff should have known that the [doctor] was not an agent" (*id.* at p. 1460).

These four cases demonstrate that a plaintiff seeking to prove that a physician is an ostensible agent of a hospital is not required to show that the patient (1) actually believed that the doctors were employed by the hospital, or (2) changed her position or otherwise relied to her detriment based upon her belief that the doctors were agents of the hospital.

As acknowledged in *Mejia,* the issue of "ostensible agency" is extensively discussed in *Jennison v. Providence St. Vincent Medical Center* (2001) 174 Or.App 219 [25 P.3d 358]. There, the plaintiff was admitted to the emergency room with severe abdominal pain. Complications arose during both surgery and postanesthetic care. Residually, the plaintiff suffered severe brain damage. During trial, the plaintiff contended that the radiologist was an ostensible agent of the hospital. Following entry of judgment for the plaintiff, the defendant appealed. The defendant contended that the trial court erroneously instructed the jury on "ostensible agency," relative to the nonemployee radiologist and the hospital. On this issue, the jury was instructed: " 'If you find that the defendant hospital had undertaken to provide radiology physicians to the community and that the plaintiffs reasonably believed that the radiologists were employed by the defendant hospital to deliver radiology services, then, in such event, the hospital would be liable for any negligence of the radiologists, if you so find.' " (25 P.3d at p. 364.)

In finding the instruction appropriate, the court stated, "[t]he applicable rule of law that we glean from the Oregon case law concerning apparent agency in the hospital context is (1) the hospital must hold itself out as a provider of medical services, and (2) unless the patient has actual knowledge of the physician's actual status as an independent contractor, the patient can recover if it is objectively reasonable for the patient to believe that physician is an employee of the hospital." (*Jennison v. Providence St. Vincent Medical Center, supra,* 25 P.3d at p. 367.) In so holding, the court emphasized that the hospital was required by law to provide radiology services and that said services were integral to the overall medical services provided by the hospital. (*Ibid.*) The court further acknowledged that, by holding itself out as providing radiological services to the community, the hospital was estopped from claiming no responsibility for the negligent conduct of their independent contractor. (*Ibid.*)

Here, while the trial court made no explicit finding on the issue of ostensible agency, it did find that the doctors were not employees of the Hospital and that the Hospital was not vicariously liable for the conduct of the doctors. With the above considerations in mind, we look to our record to determine if there is any substantial evidence to support an implied finding that Drs. Gubin and Ogata were not ostensible agents of the Hospital. In our review, we find no substantial evidence to support the trial court's conclusion that the doctors were not ostensible agents of the Hospital.

Before addressing the specific evidence, we reiterate that "[t]he reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact. [Citation.] The power of the appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Horn v. Oh* (1983) 147 Cal.App.3d 1094, 1099 [195 Cal.Rptr. 720].) The burden of proving ostensible agency is upon the party asserting that relationship. (*Oswald Machine & Equipment, Inc. v. Yip, supra,* 10 Cal.App.4th at p. 1247.) "By asserting that there was no substantial evidence to support the jury's verdict for respondent, *appellant is in fact claiming that he proved [ostensible agency] as a matter of law, and such is not established unless the only reasonable hypothesis is that [ostensible agency] existed.* [Citations.]" (*Horn v. Oh, supra,* at p. 1099, italics added.)

The issue of ostensible agency does not deal with whether an individual is in fact an actual employee, but rather, what the alleged " '*principal by his acts has led others to believe.*' " (*Tomerlin v. Canadian Indemnity Co., supra,* 61 Cal.2d at p. 644, italics added.) Here, while there was evidence that no actual agency existed, that evidence does not address the issue of what third parties reasonably believed based upon the conduct of the Hospital. On this

record, the only reasonable hypothesis of the evidence is that ostensible agency is present as a matter of law.[26]

In 1990, the Hospital applied to the State of California to establish its CPSP.[27] McCloudy set up the CPSP at the Hospital. The program was set up to provide care to members of the community who were not getting care; more specifically, to provide obstetrical care to women who were uninsured. The obstetrics department had suggested that the Hospital apply for a CPSP so that the physicians who were seeing patients in the labor and delivery department could receive compensation. The application filed by the Hospital to become a member of CPSP provides: " 'Comprehensive perinatal services providers must offer the following services to patients: Client orientation, case coordination, all routine obstetrical services, nutrition, psychosocial, nutritional, initial assessments, trimester reassessments, and postpartum assessments, interventions and referrals.' " The Hospital agreed to provide three components of the program. The Hospital arranged for a dietician, nurses, and a social worker. The physicians would come in and see the patients. Any physician that chose to practice or see patients through CPSP could do so.

From approximately 1990 to 1996, the physicians provided obstetrical services through CPSP. The program was set up at a medical office suite across from the Hospital. According to McCloudy, "[i]t was a one-stop shop for the patient."

Sterling testified that she had been employed at the Hospital since 1974. She managed the outpatient clinic. Part of her job was to coordinate the support service care for the patients. She was Shahan's case coordinator. She prepared an individualized care plan for Shahan. Dr. Gubin was the medical director of the Hospital's CPSP when it was formed and throughout its existence. He came to the clinic one or two days a week to see patients. Dr. Ogata worked with Dr. Gubin. The Hospital billed for all services provided to Shahan through the CPSP, including physician services.

Dr. Gubin testified that he and the Hospital formed the CPSP together. He was the medical director of the CPSP and saw the patients at the Hospital's outpatient facility. He saw patients of the CPSP one day a week. Shahan's

---

[26] The fact that the courts' discussion of this issue in *Seneris, Quintal,* and *Mejia* flow from the granting of nonsuit motions, is therefore of no consequence relative to our present review.

[27] McCloudy testified that the Hospital did not provide obstetric services through CPSP. She testified that the Hospital provided "the psychosocial, the educational, the nutritional, and provided a location where physicians, independent physicians came in and provided the obstetrical care . . . ." Her description of the legal relationship may well be correct. However, when looking at the issue of ostensible agency, we do not look to the actual legal relationship between the various parties, but rather whether the Hospital held the doctors out to members of the public as Hospital employees.

chart was kept at the CPSP clinic. The Hospital billed for services, including the obstetrical care; the Hospital then paid the doctors for their services.

Shahan did not have her own physician. She went to the emergency room at the Hospital. While there, she was told she was pregnant. Personnel at the emergency room referred her to Drs. Gubin and Ogata. Emergency room personnel gave her a piece of paper with the address of the outpatient clinic. There was no discussion at that time about the affiliation between the Hospital and Drs. Gubin and Ogata. About one week later, she telephoned Dr. Gubin's office. The receptionist answered, "Desert Outpatient Clinic. Dr[s]. Gubin and Ogata's clinic." The clinic is named the "Desert Hospital Outpatient Maternity Services Clinic." It was located across the street from the Hospital. About one week after scheduling the appointment, Shahan went to the clinic. She went through orientation with Carol Cribbs. Cribbs told Shahan that the program was run by the Hospital. On her next appointment, Shahan saw Dr. Gubin. He let her know that he was in charge of the clinic. After seeing Dr. Gubin, she met with Maria Sterling. Sterling told Shahan that they would inform her of all information she needed. Sterling scheduled an ultrasound, to be done at the Hospital. On February 22, Shahan saw Cribbs and Dr. Ogata at the clinic. Dr. Ogata discussed the results of the January 28 ultrasound with her. She then talked with Cribbs about diet, etc. Shahan spoke with Sterling on March 21 by phone. Sterling told her to go to the Hospital. An ultrasound was done that day. Sterling indicated to Shahan that she worked for the Hospital and was a coordinator. Sterling would make the appointments for Shahan at the main Hospital.

Here, the evidence demonstrates that the clinic was an obstetrical program for Medi-Cal patients; it was being run by the Hospital and staffed with numerous Hospital employees. From 1990 through 1996, the Hospital was an approved "comprehensive perinatal services provider," subject to the legal requirements that it provide certain obstetrical services. (See Welf. & Inst. Code, § 14134.5; Cal. Code Regs., tit. 22, §§ 51179–51179.8, 51348–51348.2.) The outpatient clinic was integral to the Hospital as the place where obstetrical services to indigent patients were performed. Prior to the setting up of the clinic, obstetrical care was delivered on an ad hoc basis in the emergency room.

At Shahan's first appointment she signed a "patient rights and responsibilities" document, which sets forth her rights to: "1. Be treated with dignity and respect. [¶] 2. Maintain your privacy and confidentiality. [¶] 3. Receive any explanations on any tests or office procedures and answer any questions you may have. [¶] 4. Receive education and counseling. [¶] 5. Review your medical record with a doctor and/or nurse. [¶] 6. Consent or refuse any care or treatment. [¶] 7. Participate in making any plans and/or decisions about

your care, and that of your baby, during the pregnancy, labor, delivery and postpartum." The document then lists certain responsibilities of the patient, such as "[b]e honest with your doctor, nurses or educator about your medical history and lifestyle," "[b]e sure you understand and to ask questions if you don't," and "[f]ollow health advice and instructions." It further states that, by signing the document, the patient acknowledges receipt of a schedule of prenatal classes and informational booklets. Finally, it states: "I understand that failure to keep my appointments, follow medical recommendations, attend classes or receive individual instruction during the course of my pregnancy may result in my being asked to seek prenatal care elsewhere." Shahan signed her name above the words, "Signature of Patient." Cribbs signed her name above the words, "Signature of Witness."

Here, the Hospital held out the clinic and the personnel in the clinic as part of the Hospital. Furthermore, it was objectively reasonable for Shahan to believe that Drs. Gubin and Ogata were employees of the Hospital. The clinic was located across the street from the Hospital. It used the same name as the Hospital and labeled itself as an outpatient clinic. Numerous professionals at the clinic were employees of the Hospital. Both Cribbs and Sterling indicated to Shahan that they were employees of the Hospital and that the program was run by the Hospital. Sterling personally set up all of Shahan's appointments at the main Hospital rather than giving Shahan a referral for the various tests. Shahan was referred by individuals in the emergency room specifically to Dr. Gubin. When she called for an appointment she was told by the receptionist that she was calling the Hospital outpatient clinic which was the clinic of Dr. Gubin. On days when Shahan would see either Dr. Gubin or Dr. Ogata at the clinic, she would also see either Cribbs or Sterling, whom she knew were employed by the Hospital.

The undisputed evidence demonstrates that the outpatient clinic was in fact a part of the Hospital. Shahan was aware that the program she was involved in was operated by the Hospital and staffed with Hospital employees. Shahan was referred to Drs. Gubin and Ogata from the emergency room rather than being told to contact a doctor of her choice. At her first appointment she signed a document titled "patient rights and responsibilities," which would unambiguously lead a patient to the conclusion that the clinic "was a one-stop shop for the patient," and that all individuals at the clinic were connected with the Hospital. All of Shahan's contacts with the physicians were at the Hospital-run clinic. Most, if not all, of the physician contacts occurred in conjunction with the provision of other services by either Sterling or Cribbs. The entire appearance created by the Hospital and those associated with it, was that the Hospital was the provider of the obstetrical care to Shahan. There is nothing in this record to suggest otherwise. Additionally, there is no evidence that plaintiff should have known that Drs. Gubin and Ogata were not the agents of the Hospital.

We therefore find that substantial evidence does not exist to support the trial court's implied finding that the physicians were not ostensible agents of the Hospital.

### 4. *The Court's Findings That the Physicians, the Hospital, and Sterling Were Not Negligent*

Amanda contends that the Hospital and Sterling were negligent as a matter of law. In particular, she argues that the Hospital and Sterling violated duties to perform certain regulatory obligations applicable to CPSP; inform Shahan of the risks disclosed in the ultrasound results and advise her of the option of terminating the pregnancy; refer Shahan to a specialist or ensure that she was so referred; and schedule and ensure completion of a followup ultrasound after March 21, 1994.

The trial court expressly found that the Hospital and Sterling were not negligent in failing to advise Shahan. The court further found that Drs. Gubin and Ogata did not act below the standard of care when they failed to offer abortion as a treatment alternative. The court's statement of decision did not make express findings as to Amanda's other arguments concerning negligence. However, as explained above, we may imply findings that the alleged acts and omissions did not constitute negligence. (*Arceneaux, supra*, 51 Cal.3d at p. 1134; *SFPP v. Burlington Northern & Santa Fe Ry. Co., supra*, 121 Cal.App.4th at p. 462.) We review both the express and implied findings for substantial evidence.

Initially, we note that Amanda's argument does not distinguish between the duties of the Hospital's nurses and the CPSP staff (including Sterling) and the duties of the physicians. We first consider Amanda's argument focusing on the duties of Sterling and the Hospital employees without regard to the duties and alleged negligence of the physicians. We then address the negligence of the physicians.

■ Amanda argues that the Hospital and Sterling failed to comply with certain obligations created by statutes and regulations governing hospitals, physicians, and CPSP. (See, e.g., Welf. & Inst. Code, § 14134.5; Health & Saf. Code, former § 1795.27 [repealed by Stats. 1995, ch. 415, § 104, p. 3333 and recodified as Health & Saf. Code, § 123148 by Stats. 1995, ch. 415, § 8, p. 3102]; Cal. Code Regs., tit. 22, §§ 51348.2, 70707.) In particular, these regulations provide the patient of a CPSP with the right "to review her medical treatment and record with her physician or practitioner, to be provided explanations about tests and clinic procedures, . . . and to participate in the planning and decisions about her management during pregnancy, labor and delivery." (Cal. Code Regs., tit. 22, § 51348.2, subd. (c).) Additionally,

hospital patients have the right to "[r]eceive information about the illness, the course of treatment and prospects for recovery in terms that the patient can understand" (*id.*, § 70707, subd. (b)(4)), and, at the relevant time, "health care professional[s]" were required, upon request, to provide patients with the results of clinical laboratory tests "in plain language" (Health & Saf. Code, former § 1795.27).

Shahan was informed of her patient rights in the "patient rights and responsibilities" given to her during her first visit to the clinic. There is no evidence in the record that the Hospital or Sterling ever denied Shahan access to her medical records, prevented her from reviewing them with a physician or nurse, or prevented her from participating in the planning and decisions concerning her pregnancy. The CPSP staff, she said, supported her and was helpful. Shahan's right to be provided with explanations about tests, Dr. Porto testified, was solely the responsibility of the physicians. Sterling and other personnel were not qualified to give Shahan the ultrasound reports or interpret them for her. Although Shahan was not informed of the results of the May 9 ultrasound, the report of that ultrasound was not received by the clinic until after Amanda was born. Kidwell, an expert with respect to CPSP compliance obligations, testified that Sterling and the Hospital's CPSP staff complied with all regulatory requirements. Dr. Porto further testified that the CPSP services provided to Shahan during her pregnancy were within the applicable standard of care. There was thus substantial evidence to support the trial court's implied finding that the Hospital and Sterling did not violate any statutory or regulatory obligation.

Amanda contends that the Hospital and Sterling were negligent in failing to inform and advise Shahan about the ultrasound results and abnormalities in Amanda's brain. Although there was conflicting evidence as to whether Dr. Ogata knew or should have known that there was an abnormality in the fetus's brain based upon the March 21 ultrasound, there was no evidence that Sterling or any other Hospital employee ever learned of the March 21 ultrasound results, talked to a physician about the ultrasound, or otherwise had any knowledge of an abnormality or problem concerning the fetus prior to Amanda's birth. Dr. Gubin testified that nurses do not discuss ultrasounds or abnormal findings with the patients. Dr. Porto testified that discussing the information in an ultrasound report with a patient would have been outside the scope of their services. Such evidence provides ample support for the court's finding that Sterling and other Hospital employees were not negligent in failing to inform or advise Shahan of the ultrasound results.

Amanda's argument that the Hospital and Sterling were negligent for failing to refer Shahan to a specialist fails for the same reason. Sterling, Kidwell, Dr. Porto, and two of plaintiff's experts—Dr. Robboy and Mary Dee

Cutler—testified that the responsibility for referring a patient to a specialist belongs to the physician, not the nurse or the CPSP staff. No physician ever asked Sterling to coordinate a referral to a specialist, and there is no evidence that a physician asked any other Hospital employee to refer Shahan to a specialist. In the absence of an instruction from a physician to Sterling or other Hospital staff to assist with a referral, no duty arises among such personnel.

With respect to the failure of the Hospital and Sterling to schedule or obtain ultrasounds, the record reflects two possible failures: the failure to obtain an ultrasound for Shahan's "next visit" at the clinic on March 29, 1994 (as reflected in Sterling's Mar. 22 notes); and the failure to obtain an ultrasound during the four-to-six-week period following the March 21 ultrasound to rule out hydrocephaly (as recommended by the radiologist).

According to Sterling, the ultrasound for Shahan's "next visit" was initially recommended by Dr. Ogata to resolve an apparent discrepancy concerning the gestational age of the fetus. There is no evidence that this size versus dates ultrasound was sought to detect or rule out any possible birth defects, or that it was intended to fulfill the radiologist's recommendation for an ultrasound in four to six weeks to rule out hydrocephaly. Amanda's expert, Dr. Sollman, testified that he would not expect a nurse to be concerned about a problem with the fetus if the purpose of the ultrasound was to resolve a size versus dates question. According to Sterling, the intervening receipt of the March 21 ultrasound report and new measurements taken at the March 29 visit would have provided the treating physician with the information Dr. Ogata sought regarding the gestational age. The repeat ultrasound, Sterling explained, was no longer needed or ordered by the physician. Dr. Gubin confirmed this explanation. There is thus sufficient evidence to support an implied finding that the Hospital and Sterling were not negligent in failing to obtain an ultrasound with respect to the March 29 visit.

Moreover, if the note to have a repeat ultrasound reflected an order that Sterling neglected to fulfill, one would expect that the physician who saw Shahan on March 29 would take some action to see that the ultrasound was promptly obtained. There is, however, no evidence in the record suggesting such action or that either of the treating physicians considered the absence of an ultrasound on March 29 to have any relevance to Shahan's pregnancy. The absence of such evidence is consistent with Sterling's explanation that the size versus dates ultrasound was no longer needed or wanted, and was not ordered by a physician.

With respect to the failure to obtain an ultrasound to rule out hydrocephaly, there was evidence from which the court could reasonably conclude that if

anyone had a duty to order the subsequent ultrasound, it was the duty of the physician, not Sterling. According to Dr. Gubin, it is the physician's obligation to *order* an ultrasound for a patient, and the nurse's obligation to *schedule* an ultrasound that is ordered by the physician. Dr. Porto testified it is the physician's responsibility to interpret the ultrasound and to determine whether any followup or further investigation is necessary; referring a patient to have an ultrasound without the advice, consent, approval, and direction of the physician is beyond the expertise of the CPSP case coordinator. Although the March 21 ultrasound report includes a recommendation from the radiologist *to Dr. Ogata* to obtain a followup ultrasound in four to six weeks, there is nothing in the record that indicates that any physician ever informed Sterling or any other Hospital employee of that recommendation, altered the original diagnosis for the pregnancy, informed any Hospital employee of either the March 21 ultrasound results or of any problem with the fetus, or instructed any Hospital employee to schedule an ultrasound to rule out hydrocephaly. Indeed, the only evidence of an order by a physician for an ultrasound after March 29 is a note in Shahan's medical chart indicating that Dr. Ogata ordered the May 9 ultrasound on May 6, 1994, and that this ultrasound was scheduled by Linda Weaver, a nurse at the clinic. Thus, regardless of whether a physician was negligent for failing to follow the radiologist's recommendation, there was sufficient evidence to support an implied finding that, in the absence of an order by a physician to obtain an ultrasound, neither Sterling nor any other Hospital employee was negligent for failing to schedule such an ultrasound.

■ Based on the foregoing and our review of the record, we conclude that there is substantial evidence to support the court's express finding concerning the absence of negligence by the Hospital and Sterling in failing to advise Shahan, as well as implied findings that the Hospital and Sterling were not negligent as to the other acts and omissions asserted by Amanda.

We turn now to the issue of the physicians' alleged negligence. The trial court concluded: "Based upon the evidence presented at trial, an elective abortion is not recommended as a treatment alternative after the twentieth (20th) week of gestation (unless the health of the mother is at substantial risk). Failing to offer an abortion as a treatment alternative cannot fall below the standard of care if, as here, the evidence showed that the fetus was beyond the twenty (20) week gestation and the mother's health was not at substantial risk. The evidence showed that the treating physician would not have recommended an elective abortion as an alternative following a second ultrasound." This conclusion is supported by substantial evidence. Dr. Porto testified that in 1994, viability of a fetus was considered to occur at approximately 24 weeks. With respect to a physician's treatment of a woman carrying a viable fetus during the third trimester of pregnancy, Dr. Porto stated that recommending or performing an abortion falls below the standard

of care unless the pregnancy threatened the life of the mother or the fetus was certain to die. Specifically, the failure of a physician to give a patient the option of an abortion under such circumstances does not fall below the applicable standard of care. Instead of informing a patient of the option of terminating the pregnancy, the standard of care in that situation requires the physician to inform the patient of problems and, depending on how serious the problems are, to formulate a plan for supportive care and management after the delivery.

According to Dr. Porto, as of the date of the March 21 ultrasound, the fetus was nearly one month past the age of viability. In his view, the March 21 ultrasound presented "an equivocal finding." It raised the possibility of different abnormalities with a "strong chance that this baby would be born completely normal and this problem would resolve itself." There could not be a definitive diagnosis at that time. Giving Shahan the option of terminating the pregnancy at that time without a definitive diagnosis, Dr. Porto testified, would have been below the physician's standard of care. Specifically, Dr. Gubin and Dr. Ogata each acted consistent with the standard of care in treating Shahan.

With respect to the May 9 ultrasound, the report of that ultrasound was not received by the clinic until after Amanda was born. There was no testimony relative to the transmission of the results from the radiologist to the clinic or that the doctors were or should have been aware of the results prior to Amanda's birth. The physicians cannot be negligent for failing to advise Shahan of the alternative of an abortion based upon the May 9 ultrasound when they had no knowledge of the ultrasound. Moreover, even if the physicians knew of the May 9 ultrasound, there is evidence from which the court could have reasonably concluded the physicians were not negligent for failing to offer abortion as an alternative. Dr. Porto testified that the report showed evidence of microcephaly and a very strong possibility that the baby would be born severely impaired. However, the report did not indicate that the fetus would suffer a "lethal birth." Nor did the medical records indicate that Shahan had any physical or psychiatric condition that would support an abortion of a viable fetus. According to Dr. Porto, it did not matter that the May 9 ultrasound was performed seven weeks after the March 21 ultrasound, rather than between four and six weeks as the radiologist had recommended; at any time after the March 21 ultrasound, the fetus was at a viable gestational age.

While the court's express finding regarding negligence is supported by substantial evidence, the court did not address the physician's duty to appropriately diagnose the underlying condition and provide the patient with the information required to make an informed treatment decision. On appeal,

as at trial, Amanda contends that Drs. Gubin and Ogata were negligent in failing to inform Shahan of the fetus's condition. Amanda argues that in failing to inform Shahan, Shahan was deprived of the ability to make an informed decision about whether to have an abortion or carry Amanda to term.

Under the doctrine of informed consent, " ' "the patient must have the capacity to reason and make judgments, the decision must be made voluntarily and without coercion, and the patient must have a clear understanding of the risks and benefits of the proposed treatment alternatives or nontreatment, *along with a full understanding of the nature of the disease and the prognosis.*" [Citations.]' [Citation.] [¶] While the physician has the professional and ethical responsibility to provide the medical evaluation upon which informed consent is predicated, the patient still retains the sole prerogative to make the subjective treatment decision *based upon an understanding of the circumstances.* [Citations.] . . . [¶] . . . A doctor might well believe that an operation or form of treatment is [un]desirable or [un]necessary, but the law does not permit him to substitute his own judgment for that of the patient by any form of artifice or deception. [Citation.]" *(Thor v. Superior Court* (1993) 5 Cal.4th 725, 735–736 [21 Cal.Rptr.2d 357, 855 P.2d 375], fn. omitted, italics added.)

The scope of the physicians' duty under this doctrine in the factual context presented here was addressed by expert witnesses. Dr. Sollman testified that it is the physician's responsibility to order the ultrasound, obtain the ultrasound film, evaluate the film and to inform the patient of the results. He stated that it is important that a patient be told and made aware of the fact of the fetus's condition and that problems be discussed. Dr. Robboy testified that Shahan had a right to be fully advised of the abnormalities indicated in the March 21 ultrasound. Dr. Porto testified that it is the physician's responsibility to interpret the ultrasound, discuss the ultrasound with the patient, and inform the patient of any problems.

Under the doctrine of implied findings, we presume that the trial court made any factual findings necessary to support the judgment. (See *SFPP v. Burlington Northern & Santa Fe Ry. Co., supra,* 121 Cal.App.4th at p. 462.) With respect to the physicians' duty to inform Shahan of any problems, we thus presume the implied finding that the physicians complied with such duty. We review this finding for substantial evidence. (*Ibid.*)

With respect to Dr. Gubin, there is no evidence that he ever reviewed the March 21 ultrasound prior to Amanda's birth. Indeed, there is evidence that indicates that Dr. Gubin did not even see Shahan after January 25, 1994. The evidence was undisputed that Shahan met with Dr. Gubin on that date. There

was conflicting evidence as to which doctor Shahan saw on February 22 and March 29. Dr. Gubin testified that he believed he saw Shahan on those dates. Shahan, however, testified that she met with Dr. Ogata on those dates. Sterling was unable to find anything in Shahan's medical chart indicating that Shahan saw Dr. Gubin on March 29. Based on such evidence, the court could have found that Dr. Gubin never saw Shahan after January 25 and that he had no occasion to review the March 21 ultrasound. Nor is there any evidence that Dr. Gubin discussed any ultrasound results with Shahan. Additionally, there is no evidence that Dr. Gubin was aware of the May 9 ultrasound results until after Amanda's birth.

Dr. Ogata did review the March 21 ultrasound report and discussed it with Shahan. He told her that the head of the fetus might be small, but that it was not a concern and that there would be a followup ultrasound. Dr. Filly testified that there was no certainty of a diagnosis of microcephaly based on the March ultrasound. Dr. Robboy testified that the March 21 ultrasound was only suggestive that something was amiss and that one could not diagnose microcephaly based on the test. Dr. Porto stated that the ultrasound presented an equivocal finding and that one could not make a definite diagnosis based thereon. The reference to enlarged ventricles, he stated, is a normal finding that needs further corroboration. He further testified that the March 21 report raised the possibility of a spectrum of abnormalities with a strong chance the baby would be born completely normal and a significant chance that the baby might not be normal. Lastly, Dr. Porto concluded that Dr. Ogata acted within the standard of care in his treatment of Shahan.

Again, as to the May 9 ultrasound, although Shahan was not informed of the results, the report was not received by the clinic until after Amanda was born. Substantial evidence exists upon which the trier of fact could conclude that the physicians' conduct did not fall below the standard of care in failing to inform Shahan of the May 9 results prior to May 13.

Thus, substantial evidence supports the trial court's express and implied findings that Drs. Ogata and Gubin were not negligent in their care and treatment of Shahan.[28]

D.–F.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[28] While the record contains substantial evidence to support findings of negligence on the part of the physicians, it also contains substantial evidence in support of the trial court's implied findings that the physicians were not negligent.

[*]See footnote, *ante*, page 475.

## V.   DISPOSITION

The judgment is affirmed.

Hollenhorst, Acting P. J., and Richli, J., concurred.

A petition for a rehearing was denied July 18, 2007, and appellant's petition for review by the Supreme Court was denied October 10, 2007, S155047.