Filed 10/13/15  Belmont Station, Inc. v. Dogz, LLC CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| BELMONT STATION, INC., | B259171 |
| Cross-Complainant and Appellant, | (Los Angeles County Super. Ct. No. NC057084) |
| v. | |
| DOGZ, LLC, | |
| Cross-Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge.  Reversed in part and remanded and affirmed in part.

Trujillo & Winnick, Anthony W. Trujillo and Alexander H. Winnick for Cross-Complainant and Appellant.

Evans & Silver, and Gregory S. Silver for Cross-Defendant and Respondent.

Following a court trial, cross-complainant and appellant Belmont Station, Inc. (sometimes referred to as Belmont) appeals a judgment awarding it only $951.99 on its cross-complaint against cross-defendant and respondent Dogz, LLC (Dogz). Belmont contends the trial court erred in finding in favor of Dogz on Belmont's third cause of action alleging a fraudulent conveyance to Dogz of Full House Enterprises, Inc.'s (Full House) 65 percent interest in CNR Holdings, LLC (CNR).

The trial court found Dogz paid fair value to Full House because, as part of the purchase of Full House's 65 percent interest in CNR, Dogz paid certain debts owed by CNR. We conclude the trial court erred in including the CNR debt payoff as part of the consideration paid by Dogz to Full House because the trial court did not make a finding that Full House was liable for CNR's debts. Therefore, we reverse and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

1. *Dogz's acquisition of Full House and Belmont's interests in CNR.*

For a number of years, Jerome Chiaro (Chiaro) operated a bar and restaurant called Belmont Station through a corporate entity, Belmont Station, Inc. Around 2005, Chiaro began discussions with Gary Roth (Roth) about a possible partnership. Eventually, Chiaro and Roth formed CNR. Roth's entity, Full House, held a 65 percent interest in CNR while Chiaro's entity, Belmont, held the remaining 35 percent. They created EVO, a new nightclub that, unlike Belmont Station, relied more on live entertainment and alcohol sales. EVO was unsuccessful. By January 2011, CNR was nearly $200,000 in debt, including a $65,000 debt owed to the landlord, a $49,000 line of credit debt with Chiaro as obligor, $32,000 owed to the State Board of Equalization for sales taxes and more than $42,000 owed to various vendors. Additionally, CNR had lost its municipal live entertainment license.

---

[1] This factual summary is based on the trial court's statement of decision, no reporter's transcript having been filed.

2

In 2010, Chiaro and Belmont brought suit against Roth, Full House and CNR alleging misrepresentation and mismanagement.

Norm Turley approached Roth and Chiaro about buying their stakes in CNR, and by the end of January 2011, after entering into separate purchase agreements with Full House and Belmont, respectively, Turley's entity, Dogz, owned 100 percent of CNR.

The agreement between Turley and Chiaro/Belmont (Exhibit 101) was for the purchase of Belmont's 35 percent interest in CNR for $150,000. As set forth in the trial court's statement of decision, "[u]nstated, but agreed to by all parties to this litigation, is Mr. Chiaro's promise to dismiss Mr. Roth from the lawsuit Mr. Chiaro and Belmont Station Inc. brought against Mr. Roth and Full House." Thus, "Turley bought more than a 35% share of [CNR] from Belmont . . . for his $150,000. He also bought Mr. Roth's dismissal from Belmont['s] lawsuit."

The agreement between Turley and Roth/Full House (Exhibit 33) was for the purchase of Full House's 65 percent interest in CNR for $100,000. Said agreement recited the purchase price was $100,000. "In fact, the evidence show[ed] that Mr. Turley paid $57,000 in cash to Full House and [also] assumed debt of $139,923 ($65,000 to the landlord, $42,279 to vendors and $32,644 to the Board of Equalization) for total consideration of $196,923."

On November 26, 2012, Belmont obtained a stipulated judgment against Full House in the amount of $275,000. Full House is insolvent.

2. *The instant proceedings*.

   a. *Pleadings.*

On January 25, 2012, Dogz filed suit against Belmont and Chiaro, alleging, inter alia, causes of action for breach of contract and fraud.

On March 14, 2012, Belmont filed a cross-complaint against Dogz and Turley, asserting various causes of action, including breach of contract, fraud and fraudulent conveyance. For purposes of this appeal, the sole cause of action at issue is the third cause of action of the operative first amended cross-complaint, alleging a fraudulent

3

conveyance. Belmont pled that Dogz's actions to transfer Full House's 65 percent interest in CNR were made to defraud Full House's creditors (including Belmont), the transfer rendered Full House insolvent, and the transfer was made without Full House having received a reasonably equivalent value in exchange for the transfer of its assets to Dogz.

b. *Trial and statement of decision.*

On January 6 and 7, 2014, the matter came on for a nonjury trial. On January 16, 2014, the trial court issued a statement of decision. With respect to cross-complainant Belmont's third cause of action for fraudulent conveyance, the trial court ruled as follows:

Belmont Station contended Full House's transfer of its 65 percent interest in CNR to Dogz "was a fraudulent attempt to avoid creditors in violation of the Uniform Fraudulent Transfers Act. In *Mejia v. Reed* (2003) 31 Cal. 4th 657, [661] our Supreme Court stated: 'Under the UFTA, a transfer can be invalid either because of actual fraud [citation] or constructive fraud [citations]; one form of constructive fraud is a transfer by a debtor, *without receiving equivalent value in return*, if the debtor is insolvent at the time of transfer or rendered insolvent by the transfer [citation].' [Citation.] Thus, the elements for fraudulent conveyance based on constructive fraud are: 1) a conveyance 2) by one who is insolvent or will become so upon the conveyance 3) for less than full value.

"Here, there can be no question but that there was a conveyance and that both Mr. Roth and Full House were insolvent thereafter. The sole question is whether [Dogz] paid full value for Full House's 65% [interest] in [CNR]. To this point, Belmont Station called Adam Minow as an expert witness. Mr. Minow is a CPA and a certified value analys[t] as well as a certified forensic financial analys[t]. He testified that there are three ways to value a business: 1) assets minus liabilities equal equity, 2) income v. expenses or cash flow analysis, 3) comparisons to comparable businesses that recently sold. Mr. Minow believes an analysis of all three methods, when possible, is the optimal way [of]

4

valuing a business. To value [CNR] as of January 2011, Mr. Minow first looked to the January 29, 2011 sale of Belmont Station's 35% interest to Mr. Turley for $150,000. Mr. Minow extrapolates that if 35% is worth $150,000, then the other 65% is worth, as a base, [$]278,571.43. Mr. Minow would add another 20% to the 65% value as a 'control premium.' That is, a premium for a percentage that gives the buyer operating control of the company. By Mr. Minow's calculation, the 65% interest in [CNR] had a value in January of 2011 of $334,285. Mr. Minow also testified that it is his understanding that Mr. Turley only agreed to pay $100,000 for the 65% interest from Full House. Mr. Minow concludes that this was far below the actual value.

"The first problem with Mr. Minow's analysis is that Mr. Turley bought more than a 35% share of [CNR] from Belmont Station for his $150,000. He also bought Mr. Roth's dismissal from Belmont Station's lawsuit. According to Mr. Turley, this dismissal was necessary before Mr. Roth would agree to sell Full House's 65% interest. The value of the dismissal has to be deducted from the $150,000 before Mr. Minow's numbers can be recalculated. For example, if the value of the dismissal is $70,000, then Mr. Turley paid $80,000 for the 35% share and the 65% is worth (with a 20% control premium) $178,285. The court is not placing a $70,000 value on Mr. Roth's dismissal, but using this number as an example of how a figure would change Mr. Minow's opinion.

"So, what then, is dismissal of Mr. Roth from Belmont Station's lawsuit worth? The answer lies in what Belmont Station was willing to take and what Mr. Roth would be willing to pay for a dismissal. No testimony was offered in this regard. In fact, Mr. Roth did not testify.

"The next problem with Mr. Minow's analysis lay in his assumption that Mr. Turley agreed to pay $100,000 for Full House's 65% share in [CNR]. Mr. Minow cannot be blamed for this errant assumption as he was only given the purchase agreement showing a purchase price of $100,000 (exhibit 33.) In fact, the evidence shows that Mr. Turley paid $57,000 in cash to Full House and assumed debt of $139,923 ($65,000 to the

landlord, $42,279 to vendors and $32,644 to the Board of Equalization) for total consideration of $196,923.

"Mr. Minow also opines that Acapulco Inn, ('AI') a bar across the street from EVO, sold a 45% interest for $217,000. Using his same valuation method, a 65% interest with a 20% control premium would be worth . . . $376,133. Since AI is a comparable business, this shows that Mr. Turley paid far below fair value. The evidence, however, shows this comparison to be misplaced. The evidence shows that AI was a well-run, profitable business with a long term lease. [CNR] under Mr. Roth was none of these things. The evidence shows that it was under heavy debt, had lost its live entertainment license and was on a month to month tenancy with a $65,000 debt to the landlord. The only asset of value was [CNR's] liquor license.

"Whether a transfer is a fraud [on] creditors is a question of fact and the burden of proving the fraud lies with the party attacking the transfer. [Citation.] While a liquor license in Long Beach's Belmont Shore area is a valuable asset, *the court cannot conclude, from the evidence before it, that the value of a 65% interest in* [*CNR*] *in January 2011 was more than the $196,923 Mr. Turley gave to Full House.* Therefore, Belmont Station has not met its burden and the cause of action for fraudulent conveyance fails." (Fns. omitted, emphasis added.)

c. *Objections to statement of decision.*

Belmont timely filed objections to the statement of decision. (Code Civ. Proc., § 634.)[2] It contended, inter alia, the trial court erred in treating Dogz's payoff of CNR's debts as part of the "consideration received by Full House for its 65% stake [in] CNR." Belmont argued there was no evidence that Full House was liable for CNR's debts, and further, a parent company traditionally is not liable for the debts of a subsidiary.

The trial court overruled Belmont's objections to the statement of decision.

---

[2]     All further statutory references are to the Code of Civil Procedure, unless otherwise specified.

6

d. *Judgment and appeal.*

On March 25, 2014, the trial court entered judgment on both the complaint and cross-complaint. On the cross-complaint, it awarded Belmont $951.99 in damages against Dogz and Turley on a breach of contract claim.

On September 19, 2014, Belmont filed a timely notice of appeal from the March 25, 2014 judgment.[3]

## CONTENTIONS

Belmont contends: (1) in determining whether Dogz paid fair consideration to Full House, the trial court erred to the extent it relied on Dogz's payment of debts owed by CNR; and (2) the trial court erred in considering extrinsic evidence that Dogz assumed CNR's debts as part of Dogz's purchase agreement with Full House, in contravention of the parol evidence rule.

## DISCUSSION

1. *General principles: payment of a debt by one who is not responsible for the debt does not constitute fair consideration for a transfer.*

Under California's fraudulent conveyance law (Civ. Code, § 3439 et seq.), "the court considers the fairness of consideration from the perspective of the creditor. Fairness and adequacy are not the same thing, because, for example, consideration flowing to a third party may be adequate but would not be fair to creditors." (3 Cal. Affirmative Def. (2d ed. 2015) § 56:1, fns. omitted.)

Thus, the "discharge of the debt of another does not, within the meaning of the Fraudulent Conveyance Act, constitute a fair consideration for a conveyance by one who is not responsible therefor." (*Hansen v. Cramer* (1952) 39 Cal.2d 321, 324 (*Hansen*).) There, Carole Cramer, who was indebted to Hansen, conveyed her separate real property to Coury. The only consideration she received for the deed was the cancellation of an

---

[3]     The notice of appeal, filed within 180 days of entry of judgment, is timely because it does not appear that notice of entry of judgment was ever served. (Cal. Rules of Court, rule 8.104(a).)

7

antecedent debt owed solely by her husband to Coury. (*Id.* at pp. 323-324.) The *Hansen* court held the discharge of the debt owed by husband was not fair consideration for the conveyance of wife's separate property, which was not liable for the husband's debts. (*Id.* at pp. 324-325.) *Hansen* explained, "the antecedent debt alleged in support of the conveyance must be a legally enforceable obligation of the grantor, and the discharge of the debt of another does not, within the meaning of the Fraudulent Conveyance Act, constitute a fair consideration for a conveyance by one who is not responsible therefor." (*Id.* at p. 324.)[4]

2. *Trial court erred in including Dogz's payoff of CNR's debts as part of the consideration Dogz paid to Full House, without making a finding as to whether Full House was liable for CNR's debts*.

As indicated, the statement of decision provides, "the evidence shows that Mr. Turley paid $57,000 in cash to Full House *and assumed debt of $139,923 ($65,000 to the landlord, $42,279 to vendors and $32,644 to the Board of Equalization) for total consideration of $196,923*." (Emphasis added.) In closing, with respect to the fraudulent conveyance claim, the statement of decision provided, "the court cannot conclude, from the evidence before it, that the value of a 65% interest in [CNR] in January 2011 *was more than the $196,923 Mr. Turley gave to Full House*. Therefore, Belmont Station has not met its burden and the cause of action for fraudulent conveyance fails." (Emphasis added.)

---

[4]    Dogz argues that in January 2011, at the time it purchased Full House's interest in CNR, Belmont was not a creditor of Full House, and that it was not until November 2012, when Belmont obtained a judgment against Full House, that Belmont became a creditor of Full House. The law is to the contrary. "It is well settled in this state that the relationship of debtor and creditor arises in tort cases the moment the cause of action accrues." (*Hansen*, *supra*, 39 Cal.2d at p. 323.) Here, Belmont's tort action against Full House accrued before Dogz purchased Full House's interest in CNR. The statement of decision indicates Belmont filed suit against Full House in 2010. Thus, at the time Full House transferred its interest in CNR to Dogz in January 2011, Full House already was a defendant in Belmont's tort action.

8

Thus, in determining that Dogz paid adequate consideration to Full House, the trial court relied in large part on Dogz's assumption of $139,923 in debt owed by CNR. The problem with the trial court's analysis is that the trial court did not make an express finding that Full House was liable for CNR's debts. Instead, the trial court simply made an implied finding, without citing any evidence adduced at trial, that Full House was liable for CNR's debts. Therefore, as explained below, the matter must be reversed and remanded for further proceedings.

a. *Appellate review of statement of decision*.

"A statement of decision explains the factual and legal bases for the trial court's decision in a nonjury trial. (Code Civ. Proc., § 632.) If the statement of decision fails to decide a controverted issue or is ambiguous, any party may bring the omission or ambiguity to the trial court's attention either before the entry of judgment or in conjunction with a new trial motion or a motion to vacate the judgment under Code of Civil Procedure section 663. (*Id.*, § 634.) *If an omission or ambiguity is brought to the trial court's attention, the reviewing court will not infer findings or resolve an ambiguity in favor of the prevailing party on that issue*. (*Ibid*.) If an omission is not brought to the trial court's attention as provided under the statute, however, the reviewing court will resolve the omission by inferring findings in favor of the prevailing party on that issue. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134; *Fladeboe v. American Isuzu Motors, Inc*. (2007) 150 Cal.App.4th 42, 59-60.) . . . . To bring an omission or ambiguity to the trial court's attention for purposes of Code of Civil Procedure section 634, a party must identify the defect with sufficient particularity to allow the court to correct the defect. (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 498.)" (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 896, italics added.)

b. *Trial court's failure to address whether Full House was liable for CNR's debts is reversible error*.

In the instant case, 15 days after the trial court issued its statement of decision, and nearly two months before entry of judgment, Belmont filed timely objections to the

statement of decision. Belmont's objections specifically cited *Hansen*, *supra*, 39 Cal.2d 321, and argued the statement of decision erroneously "implies that the payment of [CNR's] debts constitute[d] value received by Full House (the transferor)." Belmont contended the statement of decision "is ambiguous regarding why CNR's debts were assumed to also be debts of Full House without any evidence in support of this conclusion."

Based on the above, we readily conclude Belmont duly preserved its objection to the statement of decision, so as to avoid the doctrine of implied findings on appeal. Therefore, the statement of decision is defective in that it found Dogz paid fair consideration of $196,923 to Full House, including an assumption of $139,923 in CNR debt, without making a finding that Full House was liable for CNR's debt. Stated otherwise, the trial court committed reversible error in its statement of decision by failing to resolve a principal controverted issue, namely, whether Full House was liable for CNR's debts. Accordingly, the matter must be remanded for further proceedings in that regard.

On remand, if the trial court finds that the evidence adduced at trial established that Full House was liable for the $139,923 in CNR debt which Dogz assumed, the trial court will be in a position to conclude that the total consideration of $196,923 paid by Dogz constituted fair value for its purchase of Full House's interest in CNR. On the other hand, if the trial court finds that the evidence did not establish that Full House was liable for CNR's debt, the trial court will have to determine whether Dogz's $57,000 cash payment to Full House, standing alone, was sufficient to represent fair value for Full House's interest in CNR.

3. *Parol evidence rule does not preclude admission of evidence of the amount Dogz actually paid for its purchase of Full House's interest in CNR*.

Belmont contends that because Exhibit 33, the purchase agreement between Dogz and Full House, specified the purchase price was $100,000, the trial court erred in considering extrinsic evidence that Dogz assumed $139,923 in CNR debt, in addition to

paying $57,000 in cash to Full House, as part of the purchase.  The parol evidence argument is unavailing.

The parol evidence rule "protects the integrity of written contracts by making their terms the exclusive evidence of the parties' agreement." (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1171-1172 (*Riverisland*).)  The parol evidence rule "is codified in Code of Civil Procedure section 1856 and Civil Code section 1625.  It provides that when parties enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing.  [Citation.]  'An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.'  [Citations.]" (*Riverisland*, *supra*, 55 Cal.4th at p. 1174, fn. omitted.)

Although Exhibit 33 indicated the purchase price was $100,000, the parol evidence rule does not preclude the admission of evidence showing the amount that Dogz *actually paid* to acquire Full House's interest in CNR.  At this juncture, the issue is solely whether Dogz paid fair consideration to Full House for its interest in CNR.  The amount of consideration recited in the Dogz/Full House purchase agreement does not control whether or not Dogz paid fair value.  Therefore, the parol evidence rule does not preclude the admission of evidence showing that Dogz ultimately paid either less than the recited amount (e.g., only $57,000 in cash to Full House) or more than the recited amount (e.g., $57,000 in cash plus $139,923 in assumption of debt).

Accordingly, the trial court properly received Dogz's evidence that it assumed CNR's debts as part of its acquisition of Full House's interest in CNR.  The question to be addressed on remand is whether Full House was liable for those debts, so that Dogz's payment of those debts may be deemed part of the consideration which Dogz paid to Full House.

## DISPOSITION

The judgment is reversed and the matter is remanded for the trial court to redetermine, with respect to the third cause of action of the cross-complaint alleging a fraudulent conveyance, whether Dogz paid fair consideration for Full House's 65 percent interest in CNR, guided by the principles set forth herein, and to conduct further proceedings consistent with this opinion. In all other respects the judgment is affirmed. Belmont shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ALDRICH, J.

LAVIN, J.